IN THE MATTER OF THE APPLICATION OF THE BOARD OF EDUCATION OF UPPER FREEHOLD REGIONAL SCHOOL DISTRICT, MONMOUTH COUNTY.

Argued February 23, 1981—Decided June 10, 1981.

266

*Peter P. Kalac* argued the cause for appellant Board of Education of Upper Freehold Regional School District (*Kalac, Newman & Griffin*, attorneys).

*Alfred E. Ramey, Jr.*, Deputy Attorney General, argued the cause for respondent State Board of Education (*John J. Degnan*, Attorney General of New Jersey, attorney; *Stephen Skillman*, Assistant Attorney General, of counsel).

*John I. Dawes* argued the cause for respondent Governing Body of Upper Freehold Township (*Dawes & Youssouf*, attorneys; *Sanford D. Brown*, on the brief).

*Henry G. P. Coates* argued the cause for respondent Borough of Allentown (*Turp, Coates, Essl & Driggers*, attorneys).

*Lewis Goldshore* and *Marsha Wolf* submitted a brief on behalf of *amicus curiae* New Jersey Institute of Municipal Attorneys (*Goldshore & Wolf*, attorneys).

*David W. Carroll*, General Counsel, submitted a brief on behalf of *amicus curiae* New Jersey School Boards Association.

The opinion of the Court was delivered by

POLLOCK, J.

The sole issue in this case is whether the Commissioner and State Board of Education, pursuant to the constitutional and statutory obligation to provide a thorough and efficient education, can direct a local school district to issue bonds for a capital project for a public school, after the voters of the district have rejected referenda to finance the project. We conclude that the Commissioner and the State Board have the power to direct the issuance of bonds and that their order is legal authority to constitute the bonds as valid and binding obligations of the school district.

I

The Upper Freehold Regional School District (district) is a Type II school district comprised of the Township of Freehold and the Borough of Allentown. The district owns Allentown High School to which Freehold and Allentown, as well as three other municipalities, send students. A Type II district differs from a Type I district with respect to the issuance of bonds. In a Type I district, bonds may be issued pursuant to an ordinance adopted by the governing body of the municipality comprised within the district. In a Type II district, where, as here, there is no board of school estimate, bonds may be issued with the approval of the voters of the district. *Compare N.J.S.A.* 18A:24–11 *with N.J.S.A.* 18A:24–12.

Appellant, Upper Freehold Regional Board of Education (Board), administers the district. Respondents include the State Board of Education (State Board), the Township of Freehold and the Borough of Allentown. The New Jersey School Boards Association and the New Jersey Institute of Municipal Attorneys have filed briefs as amici curiae. Analysis of the issues

requires a description of the conditions at Allentown High and the administrative proceedings in this matter, as well as an understanding of the system for administering public education and the procedures by which a local board obtains funds for capital projects.

The facts are essentially undisputed. Allentown High is a one-story structure constructed in 1963 and attended by approximately 1,000 students. In 1975, the Board became aware that the building was deteriorating. Among the problems were cracked corridor floors, a deflected roof and warped and distorted windows. Following an engineering study that revealed numerous deficiencies, the Board instituted a civil action, which is still pending, against the architect and others who participated in the construction and design of the school.

From 1975 to 1978, conditions worsened steadily. The roofing blistered and cracked, permitting water leakage onto the ceiling tiles. In 1978, the Monmouth County superintendent of schools and the chief safety consultant in the New Jersey Department of Education, Division of Facility Planning Services, inspected the school. Their report concluded that due to the stress on the window frames, there was danger of injury to the students and faculty from shattering glass. The report recommended immediate repairs, and an architect retained by the Board submitted plans for repairs at an estimated cost of $1,643,000.

Following the architect's report, the Board arranged for a special referendum on December 13, 1978. The referendum sought approval for a bond issue in the amount of $2,342,000 ($1,643,000 to repair the facility, plus $699,000 to build an addition) or, alternatively, in the amount of $1,643,000 for the repair only. The voters rejected both proposals.

On the day following the rejection of the bond issue, roof stress tests were conducted. The tests concluded that, although the roof was structurally adequate to bear the required load of 30 pounds per square foot, there were other serious problems. Sagging roof planks created the danger that tiles and pieces of

concrete would fall from the ceiling. Other potential safety hazards included short-circuited electrical systems, slippery flooring and shattering glass.

During the 1978–1979 school year, rain caused puddles one-quarter to one-half inch deep stretching for hundreds of feet in the halls of the school. Students going to and from class navigated around buckets. Plastic covers were installed to catch the water in 20-gallon drums; later, 55-gallon drums were required. Conditions were so intolerable in 1978–1979 that approximately 30 classes were moved to the auditorium stage or the cafeteria. Later, classes were moved to locations outside the building. Rain poured into one room as if there were no roof. A sump pump has since been installed on the roof. The chemistry room could not be used for two months in 1978 because rain had loosened floor tiles. Water damage has since caused rotting of wooden columns and framing in the library. In other rooms, acoustical tiles have fallen from the ceiling, and water dripping onto a fire sensor has activated a fire alarm. In still other rooms, shades were drawn throughout the school year to shield against the possibility of shattering glass. To minimize danger from flying glass, some glass panes have since been replaced with plexiglass. Students have been forced to move their desks to make room for buckets, and teachers try to teach above the sound of dripping water.

Nonetheless, on April 3, 1979, the voters again rejected a bond issue. That referendum sought an amount to repair the roof ($1,643,000), plus an amount necessary to conduct school in an alternate facility during the proposed construction.

Between September 1978 and May 1980, the Board spent an additional $62,530 on temporary repairs. In spite of this, the continuing dangerous conditions of the school caused the liability insurance carrier to reduce its coverage from $1,000,000 to $500,000 and to threaten cancellation of the coverage in the absence of immediate repairs.

On April 10, 1979, the Board unsuccessfully applied to the Commissioner for emergency funding to effectuate the necessary repairs. Finally, the Board petitioned the Commissioner pursuant to *N.J.S.A.* 18A:7A–15 for an order to issue the bonds and other relief. The Commissioner referred the matter to an administrative law judge, who found, after a hearing, that the conditions were a "clearly present danger to the health and safety of pupils within the Allentown High School." He ruled that the Commissioner had not only the authority but also "the responsibility to take corrective action to enable the Board to restore Allentown High School to a condition which comports with the thorough and efficient requirements." The Commissioner adopted the findings of fact and conclusions of law of the administrative law judge. Consequently, he directed "the issuance of school district bonds in the amount of $1,643,000 for a capital project to replace the roof of Allentown High School and necessary attendant repairs."

Allentown and Freehold appealed to the State Board, which affirmed the decision of the Commissioner. The factual findings adopted by the Commissioner are not challenged on this appeal. Rather, the dispute centers on whether the Commissioner and State Board have the power to order, over voter rejection, issuance of bonds for a capital project.

Although the municipalities took no further appeal, bond counsel informed the school district that, because of the voter rejection, they could not issue a favorable opinion on the validity of bonds issued pursuant to the order of the State Board. Notwithstanding the receipt of an unstayed order from the State Board mandating the issuance of bonds, the opinion of bond counsel precluded the sale of bonds by the local Board. Consequently, bond counsel advised the Board, among other things, to file a notice of appeal to obtain an order of this Court.

Seeking relief from its dilemma, the Board appealed the decision of the State Board to the Appellate Division and filed a motion for certification of an appeal pending unheard. That

motion was denied. The Appellate Division dismissed the appeal because the Board was not a party disadvantaged by the ruling of the State Board. Before dismissing the appeal, however, the Appellate Division granted a motion of the State Board for relief under *N.J.S.A.* 18A:7A–16 and directed the issuance of bonds or such other means necessary to effectuate repairs to the roof. Still seeking to comply with the requirements of bond counsel, the Board filed a petition for certification, which we granted. 85 *N.J.* 130 (1980). To assure an adversary proceeding, we directed Allentown and Freehold to participate in the appeal. We uphold the decision of the Commissioner and State Board.

## II

Public education is one of the most cherished rights in our society. The fulfillment of that right assures our intellectual strength and renews the hope of students to achieve their potential. In public schools, children learn the fundamentals of formal education and the truth of equality of opportunity.

The obligation for the provision of public education is left to the individual states. *U.S.Const.* amend. X. The people of New Jersey have enshrined the right to public education in the State Constitution, which provides:

> The Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years. [*N.J.Const.*, Art. VIII, § IV, par. 1]

That mandate of the New Jersey Constitution places the basic responsibility for education on the Legislature. The declaration of legislative responsibility for public education, added to the Constitution by amendment in 1875, was included, virtually unchanged, in the 1947 Constitution. In turn, the Legislature has delegated the power to a combination of state and local authorities. The general supervision and control of public education is vested in the State Department of Education. *N.J.S.A.* 18A:4–1, –10. The head of the State Department of Education

is the State Board of Education, which consists of the chairman of the board, the Chancellor of Higher Education and twelve citizens appointed by the Governor with the advice and consent of the Senate. *N.J.S.A.* 18A:4–1, –3, –4. The Commissioner of Education, who is the chief executive and administrative officer of the Department, has the statutory duty to inquire into the thoroughness and efficiency of the operation of public schools. *N.J.S.A.* 18A:4–22, –24. As we have stated previously, the Commissioner has the "affirmative obligation to see to it that the statutory objectives are met" and that local school boards and governing bodies fulfill their delegated duties. *Robinson v. Cahill*, 62 *N.J.* 473, 509 n.9 (1973).

In each county, a county superintendent of schools, appointed by the Commissioner with the approval of the State Board, must monitor the condition of schools, particularly with respect to construction, heating, and ventilation. *N.J.S.A.* 18A:7–1, –8. In addition, the Legislature has delegated the primary duty for enforcement of school laws to the local boards of education. That duty includes responsibility for the conduct, equipment and maintenance of the public schools. *N.J.S.A.* 18A:11–1(b), (d). Thus, the authority and power to educate are shared by state and local agencies. Because of the vast power given to the Commissioner and State Board, it has been observed that:

> To the extent that 'local control' has been taken to mean that the educational function of government is controlled exclusively at the local level, the notion of home rule becomes an unwarranted myth. In fact, New Jersey's educational system is based on a concept of lay control, not local control, and the exercise of that power is shared among officials at all levels of government. [*R. Martinez, W. Zaino, C. Weger & J. Collins, Basic School Law* 2 (1978)]

That interrelationship of state and local authority is illustrated by the procedures for approval of capital projects and of the annual budget of a local board of education. The Public School Education Act of 1975, *N.J.S.A.* 18A:7A–1 *et seq.* (Supp.1981–1982) (the 1975 Act), requires each local board to submit annually, before January 15, a copy of the proposed budget to the Commissioner of Education for his determination of compliance with the 1975 Act. *N.J.S.A.* 18A:7A–28 (Supp.1981–1982). In a

Type II regional school district, such as Upper Freehold, the school board prepares the budget and submits it to voters of the member municipalities. *N.J.S.A.* 18A:22–7, –32 (Supp.1981–1982). If the voters reject the budget, then the governing bodies of the constituent municipalities, after consultation with the school board, must certify a budget to the County Board of Taxation. *N.J.S.A.* 18A:22-37 (Supp.1981–1982). If the governing bodies fail to make such a certification or certify less than he deems required, the Commissioner makes the necessary adjustments in a final determination. *N.J.S.A.* 18A:22–38 (Supp. 1981–1982). The Commissioner can determine the amount he deems to be necessary to fulfill the educational requirements of the district. *Ibid.*

In a similar manner, a local school district may undertake a capital project, such as reconstruction or repair of a building, and pay for it by taxes or the issuance of bonds. *N.J.S.A.* 18A:21–1(3). To spread over time the cost of a major capital expenditure, local boards generally have sought voter approval for the issuance of bonds. For example, with voter approval a Type II district may issue bonds to repair or furnish buildings. *N.J.S.A.* 18A:20–4.2.

This Court has taken an expansive view of the powers of the Commissioner and State Board of Education. *See Jenkins v. Township of Morris School Dist.*, 58 *N.J.* 483 (1971) (to achieve integration, Commissioner could refuse to allow termination of a sending-receiving relationship between districts and could direct the districts to proceed with regionalization notwithstanding absence of a specific grant of authority); *Booker v. Plainfield Bd. of Educ.*, 45 *N.J.* 161 (1965) (Commissioner can order a local school district to submit a remedial integration plan or prescribe plan of its own to correct de facto segregation notwithstanding the absence of specific statutory language authorizing such actions). In *Jenkins* and *Booker*, we held that, although the Legislature had not granted the express power to the Commissioner to correct racial segregation, it had granted the implied

power to reject or modify a plan of integration of a local school board.

In circumstances analogous to this case, we have found that the Commissioner has the implied power to appropriate additional funds for a school budget after the budget has been rejected by the voters and reduced by the governing body. We stated that, although the Commissioner had no express authority to order the budget increases, the power was derived from his duty to assure that every school district provides a thorough and efficient education. *Board of Educ. v. City Council of Elizabeth*, 55 *N.J.* 501, 506 (1970) (in Type I school districts, Commissioner has power to reject the annual school budget and to direct an increase over the amount fixed by the governing body); *Board of Educ., East Brunswick Twp. v. Township Council*, 48 *N.J.* 94, 107 (1966) (the Commissioner has power to reject and fix a budget within limits originally proposed by the Board of Education where the budget proposed by the Board was rejected by voters and modified by the governing body).

The Court stated in *Elizabeth* that the duty to assure a thorough and efficient education necessarily includes provision for adequate physical facilities. 55 *N.J.* at 506. Thus, even before the enactment of the 1975 Act, we had declared that the Commissioner had the implied power to direct capital improvements. We next consider the impact of the 1975 Act in light of the decisions of this Court in the *Robinson v. Cahill* litigation.

### III

Our commitment to fulfill the constitutional mandate to provide a thorough and efficient public education to all students led to six decisions in the *Robinson v. Cahill* litigation. We recognized in *Robinson I* that the obligation of the State to fulfill its constitutional duty not only extended to current operating expenses, but also to capital expenditures. Writing for the Court, Chief Justice Weintraub stated:

> We have discussed the existing scene in terms of the current operating expenses. The State's obligation includes as well the capital expenditures without which the required educational opportunity could not be provided. [*Robinson v. Cahill, supra,* 62 *N.J.* at 520]

In response to the first four *Robinson v. Cahill* decisions, the Legislature adopted the 1975 Act. Stating that "the sufficiency of education [was] a growing and evolving concept," *N.J.S.A.* 18A:7A–2(a)(4) (Supp.1981–1982), the Legislature defined the elements of a thorough and efficient educational system, *N.J. S.A.* 18A:7A–5 (Supp.1981–1982). The legislative guidelines in the Act include, as an essential element of a thorough and efficient education, school buildings that are "[a]dequately equipped, sanitary and secure physical facilities . . . ." *N.J.S.A.* 18A:7A–5(f) (Supp.1981–1982).

Section 5 also provides for "[e]valuation and monitoring programs at both the State and local levels." *N.J.S.A.* 18A:7A–5(j) (Supp.1981–1982). The 1975 Act provides further that the Commissioner is to review the progress of local school districts in complying with the guidelines of the Act. *N.J.S.A.* 18A:7A–10 (Supp.1981–1982). If he finds that the local board is not complying with the standards, he is directed to advise the local board of his determination and to direct the board to submit a remedial plan. *N.J.S.A.* 18A:7A–14 (Supp.1981–1982). If the Commissioner determines the remedial plan to be insufficient, he is directed to order the board to show cause why corrective action under *N.J.S.A.* 18A:7A–15 should not be utilized. *N.J.S.A.* 18A:7A–15 (Supp.1981–1982). The Commissioner is empowered also to recommend to the State Board that it take appropriate action. *N.J.S.A.* 18A:7A–15 (Supp.1981–1982).

Section 15 continues:

> The State board, on determining that the school district is not providing a thorough and efficient education, notwithstanding any other provision of law to the contrary, shall have the power to issue an administrative order specifying a remedial plan to the local board of education, which plan may include budgetary changes or other measures the State board determines to be appropriate. [*N.J. S.A.* 18A:7A–15 (Supp.1981–1982)]

If the local board fails to comply with the administrative order, the State Board may, by a proceeding in lieu of prerogative writs, seek a court order directing compliance with the administrative order. *N.J.S.A.* 18A:7A–16 (Supp.1981–1982). In addition, the evaluations and reports to be monitored by the Commissioner pursuant to Section 14 may include "[r]ecommendations for school improvements during the school year" and a "facilities survey, including current use practices and projected capital project needs." *N.J.S.A.* 18A:7A–11(g) (Supp.1981–1982).

In *Robinson V*, we found *N.J.S.A.* 18A:7A–14, –16 "[c]rucial to the success of the legislative plan, as well as to the argument that the statute is facially constitutional." *Robinson V, 69 N.J.* 449, 459 (1976). We stated that the Legislature had delegated to the Commissioner and the State Board the duty "to maintain a constant awareness of what elements at any particular time find place in a thorough and efficient system of education" and to insure the presence of "sufficiently competent and dedicated personnel, adequately equipped." *Ibid.*

The delegation of that duty carries with it the necessary power to meet the mandate of the Constitution. For this purpose, the Commissioner and the State Board have been constituted "legislative agents. They have received a vast grant of power and upon them has been placed a great and *ongoing* responsibility." *Id.* at 461.

█ Under the 1975 Act, the power given to the Commissioner and the State Board extends beyond approving the budgets as determined by the local authorities. Where these authorities are not providing a thorough and efficient education because of a failure of fiscal resources,

> then the power given the Commissioner and the State Board to effect changes in local budgets does include the power to increase such budgets beyond the amounts locally determined. Such power must of course be wisely exercised and any such exercise will always be subject to judicial review, but there is no doubt that under the terms of the Act of 1975 such power exists. [*Id.* at 462]

In the present case, the picture of Allentown High reveals a school system in which, due to deteriorating conditions, education is inadequate and inefficient, if not impossible. Those conditions contravene the constitutional right of the students to a thorough and efficient education and justify invocation of the power of the Commissioner to vindicate that right. The Constitution, the 1975 Act and our prior decisions all point toward the conclusion that the Commissioner has the power to order the issuance of bonds for a capital project to repair a school that has deteriorated to the point where a thorough and efficient education is not possible. *See* Formal Opinion of the Attorney General No. 27–1977.

In summary, the Legislature delegated its constitutional responsibility to the Commissioner and the State Board. *Robinson V, supra,* 69 *N.J.* at 461. The 1975 Act contemplates that adequate facilities are part of a thorough and efficient education. *N.J.S.A.* 18A:7A–5(f) (Supp.1981–1982). In discharging his duties, the Commissioner may direct a remedial plan, and if the plan is insufficient, he may, after notice and hearing, recommend that the State Board order corrective action. *N.J.S.A.* 18A:7A–14, –15 (Supp.1981–1982).

## IV

In this case, the hearings conducted by an administrative law judge led the Commissioner to conclude that the repairs to Allentown High were necessary and that the district should issue bonds to finance those repairs. On appeal, the State Board affirmed the decision of the Commissioner. The procedure was substantially similar to that provided by section 15 of the 1975 Act authorizing the Commissioner to recommend corrective action to the State Board, which has the power to order a remedial plan that includes budgetary changes or other measures it determines to be appropriate. *N.J.S.A.* 18A:7A–15 (Supp.1981–1982). Instead of merely recommending corrective action, the Commissioner directed the issuance of bonds, a decision affirmed

by the State Board. Although the procedure did not comport strictly with section 15, the procedural differences are insignificant. The matter was considered by the Commissioner and State Board in proceedings in which the school district and municipalities of Allentown and Freehold participated. Similarly, the authority of the State Board in *N.J.S.A.* 18A:7A–16 to obtain a court order in a proceeding in lieu of prerogative writs should not preclude application, as here, by the State Board to the Appellate Division for an order enforcing the administrative order of the State Board.

■ We recognize that the traditional and preferred method for obtaining necessary approval of bonds for a capital project in a Type II district is to obtain voter approval. In this case, however, in spite of the critical situation faced by the local board, the voters twice rejected referenda seeking approval of the issuance of the bonds. Although the Legislature has provided that voters of a school district may authorize the issuance of bonds, the Legislature has not specified that voter approval is the only acceptable method. The lack of any such restriction should be assessed in light of the constitutional mandate and statutory provisions for a thorough and efficient education. We conclude that, after voter rejection, the Commissioner may authorize the issuance of bonds for a capital project for a public school.

In addition to providing the financial support for a thorough and efficient education for school children, municipalities have other fiscal obligations to the public. Those obligations may require the issuance of bonds for capital projects unrelated to education. In this case, the amount of the proposed bond issue would not force the municipalities to exceed their debt limit. Nothing indicates that the issuance of the bonds by the district would impair the ability of the municipalities to meet other possible capital needs. We express no opinion on whether those capital needs would affect the powers of the Commissioner to authorize the issuance of bonds for a capital project for a public school.

We are confronted here with a critical problem in the Allentown High School and a record steeped in due process and public participation. There is no demonstration or suggestion that additional hearings with further public participation will provide any fresh evidence or disclose any new circumstance that would alter the determination of the Commissioner. Moreover, there has been no showing that the purpose and amount of the proposed bond issue do not correlate directly with those repairs and improvements that are essential for Allentown High to meet minimal educational standards. Given the dire conditions of the school and the lengthy administrative and judicial proceedings that have already transpired, there is no need for further hearings to determine the propriety of the order of the Commissioner directing the issuance of bonds in the amount of $1,643,000. The students and teachers of Allentown High School have been held hostage long enough. It is now time to proceed with the repairs to the school.

At oral argument, we were informed, however, that because of inflation, the estimated cost of repairs has escalated to an estimated $2,800,000, nearly two-thirds greater than the amount submitted in the 1978 referendum. If the school board determines that it is necessary to issue bonds in excess of $1,643,000, the Commissioner should hold further hearings on the increased costs. Public notice should be given in a practical manner, and the public should have an opportunity to participate in the proceedings. As further hearings on the need for the repairs are not necessary, the only issue should be the reasonableness of any increase in the bond issue over the amount previously approved.

■ Should similar cases arise in the future, the public should have the right to participate in hearings before the Commissioner. When proceeding in the face of voter rejection, the Commissioner should exercise restraint in authorizing the issuance of bonds. Any order of the Commissioner or State Board authorizing the issuance of bonds would be subject, of course, to judicial review.

Because we affirm the order of the Commissioner directing the issuance of bonds by the Board, we need not consider the alternative of obtaining funds by the issuance of refunding bonds by Freehold and Allentown. In brief, to implement the issuance of refunding bonds, it would be necessary for Freehold and Allentown to levy taxes on the taxpayers of those municipalities in the total amount of the bond issue. As explained by bond counsel at oral argument, if those taxes were not paid, Freehold and Allentown could then issue refunding bonds. Because the bonds would be the obligation of the municipalities, not the school district, the procedure poses practical problems that we need not resolve in this case.

V

We reverse the order of the Appellate Division dismissing the appeal and reinstate the order of the Commissioner and State Board of Education.

*For reversal and reinstatement*—Chief Justice WILENTZ, and Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—7.

*For affirmance*—None.