prudent manufacturer, such as Schramm, should have foreseen that the product would be used in the manner in which it was being used on the day in question. [Emphasis supplied]

The jury probably believed that plaintiff was injured through his own careless conduct which they understood as constituting misuse. The emphasized portion of the charge instructed the jury that plaintiff had to convince them that he was not misusing the machine. The charge does not explain that misuse means an unintended use. Moreover, it does not make clear that even if plaintiff was misusing the machine he could nevertheless recover if his misuse was reasonable to foresee.

The charge has the clear capacity to have led the jury to the erroneous conclusion that if plaintiff misused the machine his conduct was thereby rendered not reasonably foreseeable. The interests of justice therefore require a new trial. *R.* 2:10–2.

Reversed and remanded for a new trial.

D.S., PETITIONER-RESPONDENT, CROSS-APPELLANT, v. BOARD OF EDUCATION OF THE TOWNSHIP OF EAST BRUNSWICK, RESPONDENT-APPELLANT, CROSS-RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued December 6, 1982—Decided February 15, 1983.

Before Judges ARD, KING and McELROY.

*David B. Rubin* argued the cause for appellant board of education (*Rubin, Lerner & Rubin,* attorneys).

*Theodore A. Sussan* argued the cause for respondent D.S.

*Alfred E. Ramey, Jr.,* Deputy Attorney General, argued the cause for respondent State Board of Education (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *Deborah T. Poritz,* Deputy Attorney General, of counsel).

The opinion of the court was delivered by

KING, J.A.D.

The sole issue remaining on this appeal is the validity of a regulation of the State Board of Education, *N.J.A.C.* 6:28–4.3(g). This regulation relates to payment of residential costs incurred by placement of a child in residence at a special education facility. The regulation states

(g) Residential costs shall be assumed by the public agency which places a pupil in a residential school. A local school district shall not be responsible for residential costs when reason for placement is due to home conditions or parental choice and a free and appropriate education can be made available in a nonresidential school. Placements of pupils in residential schools by public agencies other than local school districts shall be subject to regulations governing such agencies and these regulations. These provisions do not eliminate the responsibility of a local school district to pay the day school education cost portion of a handicapped pupil's special education in a residential program when the pupil has been placed under the authority of a public agency empowered to make such placement.

The child, D.S., and his parents moved to East Brunswick in 1975 when he was five years old. In September 1976 he entered a class for trainable mentally-retarded children in East Brunswick. Upon the recommendation of the school district's child study team, he was placed in the American Institute for Mental Studies (AIMS), a private residential school in Vineland, in January 1977. The East Brunswick School Board (Board) paid his tuition fees pursuant to *N.J.S.A.* 18A:46–14 from that date but refused to pay his residential costs.[1]

In July 1977 the parents of D.S. started an action against the Board in the Chancery Division seeking reimbursement for residential costs: room, board and the like. The questioned regulation, *N.J.A.C.* 6:28–4.3(g), became effective on August 11, 1978. In February 1978 the Chancery Division judge refused to entertain the action for failure to exhaust administrative remedies and transferred the case to the State Board of Education for a determination of the board's challenge to the educational necessity of the placement.

A hearing in the Department of Education before a chief classification officer was held in the fall of 1978. In February 1979 the officer issued extensive findings of fact and conclusions of law. He concluded that the placement of D.S. at AIMS was educationally justified and not due to home conditions or paren-

---

[1]The parties have advised us that they have adjusted their differences to date and that the effect of our decision will be prospective only. Collateral litigation in the United States District Court has been concluded.

tal choice. He said, "D.S. shall remain in his current educational placement with both tuition and residential costs provided by respondent [Board].... Reimbursement for residential costs shall be subject to current practices of the New Jersey Department of Education for pupils placed in residential settings from January 1977 to the present."

The board appealed to the Commissioner of Education, claiming (1) the decision was against the weight of the evidence, (2) certain hearing procedures were defective and (3) residential costs were wrongfully imposed. On the issue before us the Commissioner rendered a decision holding the school district responsible for residential costs from the effective date of *N.J.A.C.* 6:28–4.3(g)—August 11, 1978. The board appealed to the State Board, contending that subsection (g) was *ultra vires* and unenforceable. The State Board summarily affirmed the Commissioner and upheld its regulation.

■■■ Against this background we examine whether *N.J.A.C.* 6:28–4.3(g) is an *ultra vires* and unenforceable exercise of regulation by the State Board of Education. Administrative agencies have limited jurisdiction; actions of an agency beyond its jurisdiction are *ultra vires* and void. *Swede v. Clifton,* 22 *N.J.* 303, 312 (1956). In reviewing agency action this court's function is to determine whether the agency's decision is within legislatively delegated authority. *Bergen Cty. Freeholders Bd. v. Bergen Cty. Prosecutor,* 172 *N.J.Super.* 363, 369 (App.Div.1980). The authority possessed by an administrative agency consists of powers expressly granted plus those which are reasonably necessary or appropriate to effectuate the specific delegation. *N.J. Guild of Hearing Aid Dispensers v. Long,* 75 *N.J.* 544, 562 (1978).

■■■ In New Jersey administrative regulations are accorded a rebuttable presumption of validity. A finding that a regulation is *ultra vires* is disfavored. *Id.* at 561. A grant of authority to an administrative agency is to be liberally construed to permit the agency to accomplish its statutory responsibilities. *Sheeran v. Progressive Life Ins. Co.,* 182 *N.J.Super.* 237, 248

(App.Div.1981). *See United Bldg. & Constr. Trades Council v. Camden,* 88 *N.J.* 317, 325 (1982), app. pending 51 *U.S.L.W.* 3024 (1982).

To determine whether statutory authorization for a particular administrative action exists, the reviewing court may look beyond the specific language of the delegating statute to the objective of the statute. We may examine the entire statute in light of its surroundings and objectives to ascertain whether authority is implicitly granted. *N.J. Guild, supra,* 75 *N.J.* at 562. Agency action is not precluded where it can be said to promote or advance policies and findings that served as the driving force for the legislation. *A.A. Mastrangelo, Inc. v. Environmental Protec. Dep't,* 90 *N.J.* 666, 683–684 (1982). The delegated authority should be construed to permit the fullest realization of legislative intent. *Cammarata v. Essex Cty. Park Comm',* 26 *N.J.* 404, 411 (1958). A court may readily imply any incidental powers necessary to implement such legislative intent. *Hillman/Kohan Eyeglasses, Inc. v. N.J. Optometrists Bd.,* 169 *N.J.Super.* 259, 266 (App.Div.1979).

The liberal interpretation in which the court may engage is limited by a duty to restrain agency action where there is reasonable doubt that a particular power resides in an agency. *Mastrangelo, supra,* 90 *N.J.* at 684; *In re Jamesburg High School Closing,* 83 *N.J.* 540, 549 (1980). The regulation must be within the fair contemplation of the delegation of the enabling statute. *N.J. Guild, supra,* 75 *N.J.* at 561–562.

*N.J.A.C.* 6:28–4.3(g) was promulgated by the New Jersey State Board, effective on August 11, 1978. The State Board enjoys broad legislative rule-making powers. *See In re Upper Freehold Reg'l School Dist.,* 86 *N.J.* 265, 277 (1981). The Legislature has expressly delegated these broad powers to the State Board. *N.J.S.A.* 18A:4–15 provides:

The state board shall make and enforce, and may alter and repeal, rules for its own government and *for implementing and carrying out the school laws of this state* under which it has jurisdiction. [Emphasis supplied]

### *N.J.S.A.* 18A:4–16 provides:

The state board shall have *all powers,* in addition to those specifically provided by law, *requisite to the performance of its duties.* [Emphasis supplied]

Its specific express duties include in pertinent part the general supervision of public education and the distribution of federal funds. *N.J.S.A.* 18A:4–10 provides:

*The general supervision and control of public education* in this state, except higher education, and of the state department of education *shall be vested in the state board,* which shall formulate plans and make recommendations for the unified, continuous and efficient development of public education, other than higher education, of people of all ages within the state. [Emphasis supplied]

### *N.J.S.A.* 18A:59–1 provides:

*Whenever moneys are made available for school purposes by any act of congress,* except the act of congress referred to in article 2 of this chapter, or any agency of the federal government, or made available or deposited in any manner in accordance with any law enacted by the congress of the United States, *such moneys shall be apportioned by the commissioner under plans approved by the state board,* if said moneys are for use in the public school system, or by the chancellor, under plans approved by the board of higher education, if said moneys are for use in higher education. *Such moneys shall be distributed* as aid to the several districts or *in any other manner designated* for any educational purpose defined *in the federal statutes* or in the regulations of federal agencies making allotments or in the laws of this state. [Emphasis supplied]

The State Board argues that its express power under *N.J.S.A.* 18A:59–1 to accept and allocate federal funds implies a mandate to take the necessary steps to qualify for such funding. The State Board also argues that the regulation falls within its general power to supervise and control public education under *N.J.S.A.* 18A:4–10. It contends that *N.J.A.C.* 6:28–4.3(g) was enacted to qualify this State for federal funding under the Education of the Handicapped Act of 1975, 20 *U.S.C.A.* § 1400 *et seq.* (Education Act).

The federal Education Act is a funding measure designed to assist states and local school districts in educating the handi-

capped.[2] 20 *U.S.C.A.* § 1400(c). The pertinent policies of the Education Act are well summarized in *Kruelle v. New Castle School Dist.*, 642 *F.*2d 687 (3 Cir.1981), as follows

The Education Act embodies a strong federal policy to provide an appropriate education for every handicapped child. Three interrelated purposes underlay its passage. First, Congress sought to secure by legislation the right to a publicly-supported equal educational opportunity which it perceived to be mandated by *Brown v. Board of Education,* and explicitly guaranteed with respect to the handicapped by two seminal federal cases, *Pennsylvania Ass'n for Retarded Children v. Pennsylvania* and *Mills v. Board of Education.* Second, Congress intended the provision of education services to increase the personal independence and enhance the productive capacities of handicapped citizens. Third, Congress acknowledged the need for an expanded federal fiscal role to aid state compliance with the court decisions and to assure protection for the rights of handicapped children. A cost-benefit philosophy supported these interlocking goals. Instead of saddling public agencies and taxpayers with the enormous expenditures necessary to maintain the handicapped as lifelong dependents in a minimally acceptable institutionalized existence, Congress reasoned that the early injection of federal money and provision of educational services would remove this burden by creating productive citizens.

To a large extent the Education Act establishes only procedural guidelines and safeguards, leaving school officials and parents relatively unconstrained in creating individualized education programs (IEPs) for handicapped children. Recognizing the broad range of special needs presented by handicapped children, the lack of agreement within the medical and educational professions on what constitutes an appropriate education, and the tradition of state and local control over educational matters, Congress refrained from mandating overly detailed programs. The Education Act, however, is not silent on what qualifies as a free appropriate public education (FAPE). In fact, the 1975 statute and regulations promulgated thereunder, for the first time, give definitional content to the term "appropriate education" and its component parts, "special education" and "related services."

Theoretically, the scope and details of an appropriate education which the local educational agencies are obligated to provide as a condition to receiving federal grants under the statute, are left primarily to state definition. But the term "special education" is given specific content:

The term *"special education"* means specially designed instruction, at no cost to parents or guardians, to meet the unique needs of a handicapped child, including classroom instruction, instruction in physical education, home instruction, and instruction in hospitals and institutions.

20 *U.S.C.* § 1401(16).

[2]The State must distribute at least 75% of its allocation to local and intermediate agencies and is bound by federal guidelines and eligibility requirements in the use of the funds. 20 *U.S.C.A.* § 1411(c)(1)(B), § 1412(6).

Similarly, "related services" is extensively defined:

The term *"related services"* means transportation, and such developmental corrective, and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, and medical and counseling services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a handicapped child to benefit from special education, and includes the early identification and assessment of handicapping conditions in children.

20 *U.S.C.* § 1401(17).

Moreover, the regulations promulgated under the Act explicitly contemplate residential placement:

*If placement in a public or private residential program is necessary to provide special education and related services to a handicapped child, the program, including non-medical care and room and board, must be at no cost to the parents of the child.* [Emphasis supplied].

Comment. This requirement applies to *placements which are made by public agencies for educational purposes,* and includes placements in State-operated schools for the handicapped, such as a State school for the deaf or blind. [Emphasis supplied].

45 *C.F.R.* § 121a.302. [at 690–692]

The language of *N.J.A.C.* 6:28–4.3(g) closely tracks the language of the federal regulation by requiring local districts to bear the costs of a residential placement required for educational purposes. The East Brunswick Board does not deny that the State Board enacted the regulation to become eligible for federal funding.

To qualify for funding under the Education Act a state had to develop a plan through the "state educational agency" which showed that a free and appropriate education would be available no later than September 1, 1978 to all handicapped children between the ages of 3 and 18. See 20 *U.S.C.A.* § 1412(2)(B). The plan had to show that the policy applied to all public agencies, including local boards, in the state. 45 *C.F.R.* § 121a.121. Local boards which desired funding had to submit a similar plan to the state educational agency. 20 *U.S.C.A.* § 1414(a). The State Board tells us that, prior to enactment of the state regulation, responsibility for the maintenance of residentially-placed handicapped children was not clearly defined and varied by district and school. The legislative history of the Education Act supports this view. In *S.Rep. No.* 94–168, 94th

Cong., 1st Sess. 24 (1975), reprinted in 1975 *U.S.Code Cong. & Ad.News* 1425, 1448, the Senate Labor and Public Welfare Committee announced

> ... Presently, in many States, responsibility is divided, depending upon the age of the handicapped child, sources of funding, and type of services delivered. While the Committee understands that different agencies may, in fact, deliver services, the responsibility must remain in a central agency overseeing the education of handicapped children, so that failure to deliver services or the violation of the rights of handicapped children is squarely the responsibility of one agency.

The regulation in question, *N.J.A.C.* 6:28–4.3(g), attempted to eliminate the uncertainty as to responsibility of the local boards and to ensure uniformity of treatment for children placed in residential schools.

In response, the East Brunswick Board contends that because this regulation conflicts with another state statute it is *ultra vires*. The local board argues that its responsibility in this case is limited to "tuition" and does not include room and board. This statute, *N.J.S.A.* 18A:46–14, in effect since 1954, in pertinent part provides:

> Whenever any child shall be confined to a hospital, convalescent home, or other institution in New Jersey or in any other state in the United States and is enrolled in an education program approved under this article, or shall be placed in any other State facility as defined in section three of P.L.1975, c. 212 (C. 18A:7A–3), the board of education of the district in which the child resides shall pay the tuition of said child. [*L.*1954, *c.* 178, § 5, as amended]

To buttress its argument, the school district notes that *N.J. S.A.* 18A:7A–20(a) authorizes "categorical program" state support to local districts for the costs of special education classes for trainable, mentally retarded children, for approved private school tuition, and for classes in various residential state facilities. Further, *N.J.S.A.* 18A:7B–2 authorizes deductions from state aid to local districts for tuition for each child in a district, including subtrainable, mentally retarded children, residing in a state facility. East Brunswick argues that the omission of any mention in the above statutes of the cost of care and maintenance at a private facility shows a legislative intent to excuse local boards from bearing those costs of residential placement

for education purposes. It argues that the minutes of the State Board meeting considering the regulation recognized the need for additional legislation prior to enactment of the measure. At that meeting Deputy Commissioner Lataille stated:

> The Commissioner has directed the staff to develop procedures about residential costs incurred by local school boards with federal funds when such placement meets state and federal guidelines. There's no problem in doing that for the coming year and probably one more year, so it gives us some time to seek that legal clarification.
>
> These procedures will remain in effect until the issue of local responsibility for residential costs is clarified. *I think that will require legislation. There is some proposed legislation already drafted. It hasn't been entered but would be entered, as I understand, in September when the Legislature returns.* [Emphasis supplied]

Vice-President of the Board and Chairman of the Legal Committee Brandt responded:

> MR. (DAVID) BRANDT: I think something Dr. Lataille said needs to be clarified and emphasized before we hear from the speakers because they may be speaking to something that is no longer in issue. And I have talked to Dr. Winkler on the telephone just a couple days ago concerning this.
>
> As I understand Dr. Lataille's remarks that residential costs according to the regulations must be borne by the local district, however, a process will be put in place for the forthcoming school year and for the subsequent school year by which a process will be available to each district which will be assuming residential cost to apply to the State Department of Education for reimbursement of those costs through the use of federal funds that are available to the Department under Public Law Title 6 and as a result, those hardship districts that I think many of us were concerned about, districts with a significant number of students who would require residential placement and so significant it could have program effects in that district which have an avenue of relief available to them as long as they comply with the guidelines of the Department which will be published shortly. And I think there has been a lot of discussion about that and I just wanted to emphasize that so that speakers will not be tilting windmills about something that will not be an issue for the next two years.
>
> PRESIDENT RICCI: That has been one of the critical issues raised as the funding of the residential cost and I think that does help to clarify the situation.

The State Board counters this argument by contending that the regulation is consistent with powers conferred by *N.J.S.A.* 18A:46–14, *N.J.S.A.* 18A:7A–20(a) and *N.J.S.A.* 18A:7B–2. It urges a generous construction of the term "tuition" to include "protection, care, or custody especially as exercised by a parent or guardian over a child or ward." *Webster's Third Internation-*

*al Dictionary,* 2461 (unabridged 1966). In a similar context the federal court in Utah, in *Sakezzie v. Utah State Ind. Affairs Comm.,* 215 *F.Supp.* 12 (D.Utah 1963), construed "tuition" for Indian children broadly to include books, room, board and transportation, saying:

> The expenditures made in connection with school costs to date have been justified. But the defendants have suggested that the power to expend money for "tuition" of Indians in white schools may be restricted to the payment of enrollment charges assessed by the schools. I am of the opinion that the meaning of the term in context is also broad enough to encompass charges necessary or incidental to attendance, such as for books, board and room and traveling expense,[9] within the reasonable discretion of the Commission.

---

[9] Webster's New International Dictionary, Second Edition, Unabridged defines tuition as "(1) protection; care, custody; esp., the care of a tutor or guardian over a pupil or ward; guardianship, now rare (2) the act or profession of teaching; the services of a teacher or teachers; instruction, as to give or seek tuition in latin; the fees for tuition, * * * (3) the price or payment of instruction * * *". [at 17]

To further support this construction, the State Board cites several statutes which attempt to define the concept of a thorough and efficient education. First, the Legislature has recognized that the sufficiency of education is a growing and evolving concept and that definition of a thorough and efficient education depends on the economic, historical, social and cultural context of education. *N.J.S.A.* 18A:7A–2(a)(4). Second, the Legislature established statutory guidelines for the implementation of a thorough and efficient education, including the provision of "programs and supportive services for all pupils, especially those who are educationally disadvantaged or who have special educational needs." *N.J.S.A.* 18A:7A–5(e). Third, *N.J.S.A.* 18A:46–13 provides:

> It shall be the duty of each board of education to provide suitable facilities and programs of education for all the children who are classified as handicapped under this chapter except those so mentally retarded as to be eligible for day training pursuant to *N.J.S.* 18A:46–9. The absence or unavailability of a special class facility in any district shall not be construed as relieving a board of education of the responsibility for providing education for any child who qualifies under this chapter.

The State Board also argues that a narrow interpretation requiring local boards to pay only tuition would encourage them to

send children outside the district rather than develop programs and facilities within the district.

East Brunswick contends that the Supreme Court's decision in *Levine v. Institutions & Agencies Dep't.,* 160 *N.J.Super.* 591 (App.Div.1978), mod. and remanded 84 *N.J.* 234 (1980), rejects such a definition. There the Appellate Division wrote

> It is apparent from the complaint that plaintiffs' thesis equates the entire scope of the custodial care and maintenance provided to their child at Totowa with educational services and concludes that, in as much as he is entitled to a thorough and efficient education by the State, without direct charge therefor, neither the child nor the parents may be assessed and compelled to pay for such "educational services." The very statement of the proposition reveals its fallacious nature. Custodial care and maintenance of a child in an institution such as Totowa for a full 24 hours each day consists of considerably more in the way of services than administering to educational needs. The characterization by plaintiffs of the whole of their child's general 24 hour a day custodial care and maintenance as "educational services," at best is a perversion and utterly specious. We reject the contention out of hand. [160 *N.J.Super.* at 594]

The question raised by the instant case is difficult but in our opinion the State Board has the stronger argument. The broad delegations of power to the State Board must be read in light of New Jersey's constitutional mandate to provide a thorough and efficient system of free public education. See *N.J. Const.* (1947), Art. VIII, § IV, par. 1. The right of children to a thorough and efficient system of education is fundamental under our State Constitution. *Robinson v. Cahill,* 69 *N.J.* 133, 147 (*Robinson IV*), cert. den. *sub nom. Klein v. Robinson,* 423 *U.S.* 913, 96 *S.Ct.* 217, 46 *L.Ed.2d* 141 (1975), injunction vacated 69 *N.J.* 449 (*Robinson V*), 70 *N.J.* 155 (*Robinson VI*) (enjoining expenditure of funds for public schools), amended 70 *N.J.* 464, injunction vacated 70 *N.J.* 465 (1976). The ultimate goal of a free public education as embodied in the provision is to equip children to function economically, socially and politically in a democratic society. *N.J.S.A.* 18A:7A–4; *Levine, supra,* 84 *N.J.* at 247. The education of children classified as "trainable" promotes the purpose of that goal, and the guarantee of a thorough and efficient free public education extends to such children. *Id.* at 252–253.

The obligation to fulfill the constitutional mandate falls on the Legislature which has delegated the obligation to the State Board and the Commissioner of Education. *Freehold, supra,* 86 *N.J.* at 278; *Robinson V, supra,* 69 *N.J.* at 460–461. In response to the *Robinson* saga, the Legislature has attempted to define the concept of a thorough and efficient education. See *N.J.S.A.* 18A:7A–5; *Freehold, supra,* 86 *N.J.* at 276. It accepted the responsibility of delegating appropriate authority to state and local agencies to establish goals and objectives consistent with the legislative guidelines, one of which calls for programs and support services for pupils with special educational needs. *N.J. S.A.* 18A:7A–2(b)(3); *N.J.S.A.* 18A:7A–5(e). Discussing the State Board's express power to order changes in local budgets under *N.J.S.A.* 18A:7A–14 *et seq.,* the Supreme Court wrote:

... These provisions allocate to the Commissioner of Education and to the State Board of Education a two-fold continuing responsibility: *first, to maintain a constant awareness of what elements at any particular time find place in a thorough and efficient system of education, as this concept evolves through the inevitably changing forms that it will take in the years to come;* second, to insure that there be ever present, sufficiently competent and dedicated personnel, adequately equipped, to guarantee functional implementation, so that over the years and throughout the State each pupil shall be offered an equal opportunity to receive an education of such excellence as will meet the constitutional standard. [*Robinson V, supra,* 69 *N.J.* at 459–460; emphasis supplied]

The court characterized the Commissioner and State Board as "legislative agents" for the purpose of fulfilling this mandate. *Id.* at 461.

In delegating duties to the State Board the Legislature did not specifically direct the Board to create an eligible status for federal funding. It recognized, however, the responsibility to establish a funding structure to ensure adequate financial resources to enable a system of free public schools to operate throughout the State. *N.J.S.A.* 18A:7A–2(b)(4). Further, the Senate Education Committee Statement to A. No. 86, *L.*1979, *c.* 207 (codified at *N.J.S.A.* 18A:7B–1 *et seq.*), suggests that the amendments adopted in 1979 increased the costs to be borne by districts to comply with the federal Education Act. It reads as follows:

Funding: Educational programs in State facilities are now funded through the appropriations process. In previous years, all education expenditures came out of the general appropriation to each facility; because of competing priorities, education was often insufficiently supported. The budget for the present fiscal year includes a separate line item for education in these facilities, but in most cases the appropriation remains insufficient to provide an education which meets State standards.

There is at least one lawsuit now pending to require State institutions to comply with the T & E law; in addition, there is some question whether some of the facilities can meet the requirements of a federal law (P.L. 94–142) which requires a free and appropriate education for all handicapped children. The bill should provide sufficient funds to enable compliance with both statutes.

School districts are now required by law (*N.J.S.* 18A:46–14) to pay tuition for any of their children who are in institutions. This law has never been enforced, chiefly because the tuition charges would have created a serious financial burden for some districts. Under Assembly No. 86, however, the tuition will be paid chiefly with State aid; the amount of tax levy needed to support any child will be limited to the difference between the equalization aid received by the district for the child and the State average net current expense budget per pupil. On the average, the amount of tax levy required for pupils in State facilities will be the same as that for pupils attending class in the local districts. Further the total cost of tuition will be offset by a general increase in equalization aid for the district; this will result from the added enrollment and the consequent lowering of the per pupil wealth of the district.

The bill will require school districts to pay tuition for all children in State facilities, including those classified as eligible for day training. The school districts presently have no obligation to provide facilities or programs for children eligible for day training nor do they have any responsibility to pay for their education. Tuition for them will therefore be an added burden for the districts, but once again the cost in tax levy will be lessened by the State aid generated when these children are added to the rolls of the district.

The enactment of *N.J.A.C.* 6:28–4.3(g) may be interpreted as an exercise of the State Board's general rule-making power under *N.J.S.A.* 18A:4–15 to implement its constitutional mandate. The State Board is entrusted with the responsibility of determining the elements of a "thorough and efficient education" as the concept evolves. Part of that responsibility is to insure adequate funding for programs and facilities for the education of all educable children. See *N.J.S.A.* 18A:7A–2(b)(4). Cf. *Freehold, supra,* 86 *N.J.* at 278–279 (recognizing the Commissioner's power under *N.J.S.A.* 18A:7A–15 to authorize the issuance of bonds over local objection). The State Board could readily find that federal funds would ease the burden on the

local districts and promote the goal of a thorough and efficient education. The legislative history suggests that this decision was ratified in 1979, when the Legislature appears to have taken measures to comply with the federal Education Act. At that time, after the enactment of the administrative regulation in question, the Legislature was concerned that some New Jersey facilities failed to comply with federal standards.

 Against this backdrop *N.J.S.A.* 18A:46–14 and *N.J.S.A.* 18A:7A–20(a) should not be interpreted to exempt local districts from the payment of residential costs. Despite the argument of the State Board, the term "tuition" in *N.J.S.A.* 18A:46–14 must be accorded its customary meaning which does not include room and board. See 2A *Sutherland, Statutory Construction* (Sands, 4 ed. 1973), § 46.01 at 48. But, although the omission to mention residential costs might generally lead to the conclusion that they were excluded, see *Sutherland,* § 47.23 at 123, this conclusion does not necessarily follow in this case. Both of those sections were amended subsequent to the *Levine* decision, the enactment of the questioned regulation and the enactment of the Education Act. Neither amendment specifically disavowed the validity of the regulation. *N.J.S.A.* 18A:7A–20(a) enumerates the situations in which the state will assist local districts, it does not enumerate every cost which districts must bear. The statement accompanying the amendment in 1979 contemplated both state and federal funding, but the statute was addressed only to state assistance. *N.J.S.A.* 18A:46–14 only mentions the cost of tuition. But the section taken as a whole is susceptible of the interpretation that the Legislature was primarily concerned with the location of facilities and services and with fixing the cost on the district placing the child. In this context, the failure to mention residential costs need not be interpreted to exclude them inferentially in the entire statutory and regulatory scheme when they are nowhere specifically excluded. The State Board's broad power includes the power to adapt the responsibilities of the districts to the evolving requirements of education. *See Cammarata, supra,* 26 *N.J.* at 413 (the essential

object of delegating broad rule-making power is to encourage the adoption of regulations which are suited to the exigencies of unforeseen and changing circumstances).

In its brief the East Brunswick Board contends that "federal reimbursement funds have now dried up." This is no reason for us to negate the regulation or parsimoniously construe the State Board's implied powers to provide for the appropriate education of the physically or intellectually disadvantaged. If a true economic dilemma exists, the remedy is through the normal political process, not through judicial emasculation of regulatory power. The allegedly impacted local boards may in concert petition the Executive, the State Board and the Commissioner to amend or abolish *N.J.A.C.* 6:28–4.3(g) or create a fairer allocation of the residential costs incurred.

In conclusion, our decision that the State Board has implied power to place the costs of residential care incident to a thorough and efficient education of the mentally retarded on the local boards is fortified by the recent statements of our Supreme Court in *N.J. Ass'n for Retarded Citizens v. Human Services,* 89 *N.J.* 234 (1982):

> We have previously recognized the Legislature's strong moral and legal commitment to care for the handicapped. *Levine v. Dept. of Institutions and Agencies of N.J.,* 84 *N.J.* 234, 249 (1980). It has not only enacted a bill of rights for the developmentally disabled, *N.J.S.A.* 30:6D–1 to –12, but has vigorously sought to improve the services offered to the mentally handicapped. The record in this case demonstrates that the Departments of Education and Human Services are sincerely attempting to carry out their statutory mandates. [at 249]

> • • • • • • • •

> ... The Legislature has declared it the policy of this State to maximize the developmental potential of these citizens while affording them the maximum feasible personal liberty. Like all other citizens, the mentally retarded have the right to pursue happiness. Unlike other citizens, they have unique hurdles to overcome in doing so. Rather than exclude them from the pursuit of happiness, the Legislature has made an effort to include them in our civic community by providing them the special services they need to develop and grow. This public policy affirms our common humanity. Their concerns are our concerns. In this State, we do not set people adrift because they are the victims of misfortune. We take care of each other. [at 252]

To place the residential costs exclusively on the parents would result not in equality but in advantage for the economic elite, a concept incompatible with our constitution, statutory and regulatory schemes and our Supreme Court's analysis of them.

The cross-appeal is dismissed as moot.

Affirmed.