266 N.J. Super. 531 (1993)
630 A.2d 333
PATRICIA DESILETS ON BEHALF OF AND AS NATURAL GUARDIAN OF BRIEN DESILETS, PLAINTIFF-RESPONDENT,
v.
CLEARVIEW REGIONAL BOARD OF EDUCATION, MICHAEL P. TOSCANO, SUPERINTENDENT, AND CHARLES BISHOP, PRINCIPAL, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Submitted January 19, 1993.
Decided July 29, 1993.
*532 Before LONG, D'ANNUNZIO and KEEFE, JJ.
Capehart & Scatchard, attorneys for defendants-appellants (Alan R. Schmoll, of counsel, Robert A. Muccilli, on the brief).
The American Civil Liberties Union of New Jersey, for plaintiffs-respondent (William H. Buckman, of counsel and on the brief; Linda Elwell, on the brief).
The opinion of the court was delivered by KEEFE, J.A.D.
The issue to be decided in this appeal is whether defendants' action in censoring, prior to publication, two movie reviews written by plaintiff Brien Desilets for his junior high school newspaper, violated plaintiff's federal or state constitutional rights.
Plaintiff Patricia Desilets, on behalf of and as natural guardian for her son, Brien Desilets,[1] filed a complaint against defendants Clearview Regional Board of Education (Board), Michael Toscano, superintendent, and Charles Bishop, principal, alleging that their actions in censoring two articles written by plaintiff for the school *533 newspaper violated plaintiff's state and federal constitutional rights.[2]
Defendants defended the censorship, claiming the school paper was part of the regular educational curriculum over which the Board had the authority to exercise a great deal of control, and that defendants' actions were reasonably related to a legitimate pedagogical concern.
After a plenary trial, the trial judge issued an oral opinion in which he concluded that plaintiff's State, but not his federal, constitutional rights had been violated. Defendants now appeal that decision.
Plaintiff began attending Clearview Junior High School in September 1987 when he entered the seventh grade. In November of that year, he became involved in the school newspaper, known as the Pioneer Press. Any student could become a staff member of the paper, which covered such topics as sports, entertainment and news. The staff met after school, and had no set number of issues which it published. There were no grades or course credit given for participation on the paper. Students usually volunteered to type the articles themselves, and the student editors would select pictures to go along with the articles. The paper was distributed to all the students at the junior high school, as well as to all staff. Each issue would be reviewed by a faculty advisor assigned to the paper. The newspaper was totally funded by the Board; that is, the Board paid the faculty advisor's salary and paid for all materials and supplies.
*534 In January 1989, when plaintiff was in the eighth grade, he submitted the following two movie reviews to the faculty advisor for publication in the Pioneer Press:
Mississippi Burning Rated R (Starring William Dafoe and Gene Hackman) Mississippi Burning is about the murder of three civil rights activists in Philadelphia, Mississippi in 1964. Two F.B.I. agents, Hackman and Dafoe, are sent to Mississippi to investigate the disappearance of the three men. When they arrive, they find themselves unwanted by the people and the local police. None of the blacks will talk to the men, because they are harassed by the KKK (Ku Klux Klan) for doing so. In the end the bodies are found, the police and Klan members are jailed and the F.B.I. leaves. The movie is worth the price of your ticket, but if you're looking for facts they're not here.
Rain Man Rated R (Starring Tom Cruise, Dustin Hoffman) In this film, Charlie Babbit (Tom Cruise) finds that he has a brother Raymond (Dustin Hoffman) that has inherited three million dollars in their father's will. However, Raymond is autistic and does not understand the concept of money. Charlie then kidnaps "Rain Man" from a mental institution, and the two leave for a week long drive across the country. On this ride the two become great friends and experience many adventures. Dustin Hoffman did an excellent job of playing an autistic savant. The movie is hilariously funny and I think that everyone should see it.
The faculty advisor had no objection to the articles and never told plaintiff that they violated school guidelines. When the February, 1989 issue of the Pioneer Press was distributed, plaintiff discovered that his movie reviews had not been published. The faculty advisor told plaintiff that defendant Bishop, the school principal, had taken the articles out because the movies were R-rated. (An R-rated film requires a child under 17 seeking admission to the theater to be accompanied by a parent or guardian). Defendant Bishop told plaintiff that he had a responsibility to the community, and that the reviews would prompt students under age 17 to see these movies. Defendant Toscano also told plaintiff that he did not think the parents of the students would like to see these articles, and that he would not let R-rated films be reviewed in a school newspaper while he was superintendent, "unless he was persuaded by good points of why they should be."
Plaintiff testified that he had seen both movies with his father and brother, and that one of his teachers had recommended the movie Mississippi Burning because it dealt with the subject of civil rights; a subject about which the class had been studying.
*535 Superintendent Toscano, who had been with the district since October 1987, testified that he supported the principal's decision to censor the articles because they dealt with subject matter which was inappropriate for junior-high school students. Toscano admitted, however, that he had "no problem with Brien's review itself."
Toscano also felt that the mere inclusion of an R-rated movie review in the school paper would tend to encourage students to see these movies because students at this age are looking for the "hidden adventure." He also believed that the mere mention of a movie in the school paper would be viewed as an endorsement of that movie from the school district itself. In Toscano's view, nothing short of total censorship would work; that is, a disclaimer from the Board would not sufficiently counteract the implied endorsement.
Plaintiff introduced into evidence other issues of the Pioneer Press which had been published and distributed while he was a student at Clearview. Those issues began in October, 1987 and ended in June, 1990. Apparently, in a June, 1988 issue (a copy of which has not been provided on appeal), there were movie reviews of three R-rated movies: Rawhide Rats, The Stepfather, and Children of the Corn. Toscano claimed that those reviews were published prior to a time when he and the Board had a full understanding of Hazelwood v. Kuhlmeier, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988). According to Toscano, defendants took a different look at the contents of their school publications following Hazelwood because the decision gave school boards greater discretion in deciding the content of school-sponsored publications.
Toscano also conceded that the January, 1990 issue of the Pioneer Press had included results of a student poll regarding their favorite songs and movies from 1989. Interestingly, Rain Man was number five on the favorite movie list. Toscano also admitted that a teacher could appropriately discuss a movie such as Mississippi Burning in class, because a structured classroom discussion regarding racial violence was far different from a movie *536 depicting the same subject. He did not offer to explain how such a movie could be discussed by students without it first having been seen by them in the company of a parent or guardian.
Toscano also admitted that the school board had approved an official policy regarding student publications. Specifically, the policy stated that student publications were sponsored so that pupils may learn the rights and responsibilities of the press in a free society. Such publications had to be generally suitable for all pupils at the school, and the administration was to evaluate all student-sponsored material to ascertain its suitability.
In particular, according to the policy, the following categories of materials were deemed to be unprotected by the right of free expression because they violated the rights of others: (a) items grossly prejudicial to an ethnic, religious or racial group; (b) libelous material; (c) material which sought to establish the supremacy of a particular religious point of view; (d) material which advocated the use or advertised the availability of any substance believed to constitute a danger to student health; (e) obscene material or material "otherwise deemed to be harmful to impressionable students who may receive them"; (f) material which advocated violence or force; (g) advertisements for profit-making organizations; (h) material which failed to identify the student responsible for its publication; (i) material offered for sale to other students; (j) solicitations for other than school organizations, which are not previously approved by the Board; and (k) material supporting or opposing a candidate for election to the school board, or the adoption of any bond issue. Toscano admitted that there was no specific policy regarding R-rated movie reviews. However, when the Board met subsequently to discuss plaintiff's situation, they agreed that the action taken by Bishop and Toscano was consistent with the Board's currently existing policy.
According to Toscano, the reviews in question here fell within the prohibited category "d" listed above, because they advocated the seeing of R-rated movies. No explanation was offered as to *537 how the review posed a "danger to student health." Toscano conceded that plaintiff's reviews did not advocate seeing these movies without parental permission.
In addition to the policy regarding student publications, another policy of the Board relating to students' rights is relevant to defendants' action herein. Board policy number 5145 provides that no student should be deprived of the basic right to equal treatment and equal access to the educational program, due process, the presumption of innocence, free expression and association, and the privacy of his or her own thoughts. However, the policy was qualified in that the Board believed that students of different ages and maturities differed in their ability to handle these rights and responsibilities. Accordingly, each right was granted with due regard for the degree of responsibility possessed by the student and his or her need for continuing guidance and control.

I.
After reviewing the evidence, the trial judge in the instant matter held that Hazelwood, supra, was controlling with regard to the federal constitutional claims made by plaintiff. Accordingly, he rejected plaintiff's argument that Hazelwood was distinguishable on the ground that the Pioneer Press was not part of the regular school curriculum as was the Hazelwood school paper. He also rejected plaintiff's argument that the Pioneer Press was a public forum. The judge then concluded that under the Hazelwood standard, the board's decision to censor plaintiff's articles must be upheld, because the superintendent's decision was reasonably related to legitimate pedagogical concerns.
Choosing, however, not to base his decision on the federal Hazelwood standard, the trial judge then turned to the New Jersey Constitution, and found that its provision regarding freedom of expression was more expansive than that of the First Amendment. The judge was satisfied that our own Supreme Court would adopt a more expansive test than the one adopted in *538 Hazelwood. As such, the test which the trial court offered as a substitute for the test in Hazelwood was one which required the school to show that there were no less oppressive means available which would satisfy the school's concerns, and that the control exercised by the school was viewpoint-neutral.
Applying that standard here, the judge found that the school could have disassociated itself from the movie reviews by including a disclaimer to the effect that the school did not endorse these movies, and by reminding students that they could not see them unless accompanied by a parent. He suggested that some of the ways the school could have shown it was viewpoint-neutral would have been by banning all movie reviews in the paper, or by not sponsoring a paper at all.
Since the movie reviews in question were too dated to be of any interest to anyone at that point, the judge proposed a remedy whereby plaintiff would submit to the school newspaper a statement regarding the instant lawsuit. Although defendants now appeal from the judge's decision, they do not separately challenge the remedy which he ordered.
We agree with the trial judge that the Pioneer Press was not a public forum, but we disagree with his conclusion that under the Hazelwood standard, defendants did not violate plaintiff's First Amendment rights.[3]

*539 II.
The controversy giving rise to the litigation in Hazelwood arose when the principal objected to two particular student newspaper articles. One article described the personal experiences of pregnancy of three students. Although the students used false names, the principal feared that they could nevertheless be identified. Also, the principal objected because the article contained references to sexual activity and to birth control; topics which the principal felt were inappropriate for the younger students at the school. Hazelwood, supra, 484 U.S. at 263, 108 S.Ct. at 565, 98 L.Ed.2d at 600.
The second article to which the principal objected discussed the impact of divorce on students at the school. One student in particular, who was identified by name, complained about her father. The principal felt that the parents in question should have either consented to the article's publication or been given the opportunity to respond. Both articles were ultimately withheld from publication upon the principal's orders. Id., 484 U.S. at 264, 108 S.Ct. at 566, 98 L.Ed.2d at 600. Expert testimony at trial established that the articles did not meet journalistic standards of fairness and balance. Id., 484 U.S. at 275, 108 S.Ct. at 572, 98 L.Ed.2d at 608 (f.n. 8).
Dealing first with the question of whether the newspaper was a forum for public expression, the Supreme Court held that school facilities are public forums only when the authorities have, by policy or practice, opened these facilities for indiscriminate use by the general public or by some segment of the public. If, on the other hand, the facilities have been reserved for "other intended purposes," then the forum is not a public one, and the school may impose reasonable restrictions on the speech occurring there by members of the school community. Id., 484 U.S. at 267, 108 S.Ct. at 567-68, 98 L.Ed.2d at 603.
Since the school-sponsored publication at issue in Hazelwood was developed within the adopted educational curriculum and was part of a regular classroom activity, taught by a faculty member *540 during regular class hours who exercised a great deal of control over the publication, and since the students received grades and academic credit for the course, the Court concluded that the newspaper was not a public forum. 484 U.S. at 268-69, 108 S.Ct. at 568-69, 98 L.Ed.2d at 603-04. Rather, the school officials reserved the forum for its intended purpose as a supervised learning experience for journalism students, and as such, were entitled to regulate its content in "any reasonable manner." 484 U.S. at 270, 108 S.Ct. at 569, 98 L.Ed.2d at 605.
Plaintiff urges a different result here. He claims that because the Pioneer Press was an extra-curricular activity for which students received no academic credit, grades, or formal instruction, it was unlike the student publication in Hazelwood, and was instead a forum for the free exchange of ideas. We disagree.
The Hazelwood Court makes it clear that school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public "might reasonably perceive to bear the imprimatur of the school," are fairly characterized as part of the school curriculum, whether or not they occur in the traditional classroom setting, as long as they are supervised by faculty members and designed to impart knowledge or skills to the student participants and their audiences. Hazelwood, supra, 484 U.S. at 270-71, 108 S.Ct. at 569-70, 98 L.Ed.2d at 605. In our view, then, the Hazelwood Court did not limit its holding to classroom activities only, and its emphasis on "curricular" activities must be read in light of the very broad definition which it gave to that term.

III.
Turning to the Hazelwood standard itself, the Supreme Court held that educators must be entitled to exert control over student publications to assure that the students learn the lessons the activity is designed to teach, that readers are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously *541 attributed to the school. Therefore, "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive-activities so long as their actions are reasonably related to legitimate pedagogical concerns." 484 U.S. at 273, 108 S.Ct. 571, 98 L.Ed.2d at 606 (footnote omitted, emphasis added). Examples of appropriate pedagogical concern include speech that is "ungrammatical, poorly written, inadequately researched, biased or prejudiced, vulgar or profane." 484 U.S. at 271, 108 S.Ct. 570, 98 L.Ed.2d at 605.
However, when censorship of a school-sponsored publication has no valid educational purpose, the First Amendment is directly implicated and requires judicial intervention. Substantial deference to educational decisions does not require a wholesale abandonment of First Amendment principles simply because the medium for the student's expression is funded by a school board. The holding in Hazelwood must be understood in the context of the Court's preceding decision in Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).
Students in the public schools do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." They cannot be punished merely for expressing their personal views on the school premises  whether "in the cafeteria, or on the playing field, or on the campus during the authorized hours,"  unless school authorities have reason to believe that such expression will "substantially interfere with the work of the school or impinge upon the rights of other students. (Citations omitted).
[Hazelwood, supra, 484 U.S. at 266, 108 S.Ct. 567, 98 L.Ed.2d at 602].
For the defendants in the instant matter to say that censorship here was justified by pedagogical concerns does not make it so. The curtailment of cherished First Amendment rights mandates careful analysis of the reasons given for the censorship in light of the facts of this case to determine if there is any valid educational purpose to support the censorship.
The significant distinction between Hazelwood and this case is that the material in Hazelwood was censored because of its content and journalistic style. In the instant matter, it is conceded *542 that the censorship had nothing to do with the style of the review. Nor was the content of the reviews a basis for the censorship, but only its subject matter. (This is an important distinction; content is what is written; subject is what is written about.) Defendants concede that nothing contained in plaintiff's reviews was offensive, lewd, vulgar, obscene, libelous, insulting to the rights of others, likely to be disruptive of or interfere with orderly school conduct and discipline, or inappropriate for immature audiences. There was no hint in the reviews as to what it was about the movies, e.g. theme, violence or language, that brought about the R-rating. Further, the reviews in no way implied that the reader should see the movies without parental guidance. Thus, the decision to censor was based solely on the fact that the subject matter of the review was R-rated. The point of the censorship was not to address stylistic deficiencies or the words chosen by the writer to convey his information; it was to suppress the idea itself. Defendants' conclusion that all R-rated movies are inappropriate for plaintiff's age group reads more into the movie rating system than is intended by the system itself, and is inconsistent with the system's purpose. The purpose of the R-rating is to alert parents of the need for discretion and scrutiny in deciding whether a movie should be viewed at all. Subsequently, if the decision is to allow the child to see the movie, a parent or guardian is then required to accompany the child to provide guidance on the subject for which it was R-rated.
From the outset the purpose of the rating system was to provide advance information to enable parents to make judgments on movies they wanted their children to see or not to see. Basic to the program was and is responsibility of the parent to make the decision.
........
The only objective of the rating system is to advise the parent in advance so he or she may determine the possible suitability or unsuitability of viewing by children. But, to repeat, the rating would not even make a final judgment on that, except for the X rating. The parent's decision remains the key to children's attendance.
[THE VOLUNTARY MOVIE RATING SYSTEM, JACK VALENTI, PRESIDENT AND CHIEF EXECUTIVE OFFICER, MOTION PICTURE ASSOCIATION OF AMERICA, INC., 1987. p. 4]
*543 The emphasis on parental responsibility is reflected in the qualifications for Rating Board membership. A member must have a "parenthood experience" and must exhibit a "capacity to put himself or herself in the role of most parents and view a film as most parents might  parents trying to decide whether their younger children ought to see a specific film." Id. at 5. The advisory to parents stemming from a film that is rated "restricted, under 17," results from the Board's judgment that the film contains "mature material" relating to "language, violence, nudity, sexuality or other content." Id. at 8. A film with "explicit sex" will be rated X, not R. However, an R-rated film may contain nudity and lovemaking. Further, a film will be rated R if it contains "rough" language or "hard" violence or if "drug use content" is included.
The question of how much of this mature material should be seen by a child under 17 can become controversial. Clearly, the answer depends upon the level of the child's maturity and the parents' moral code regarding such issues. For that reason, a decision concerning the appropriateness of a movie's content is ultimately a parental one, not an educational one.
As noted earlier, one of plaintiff's teachers recognized the educational benefit of Mississippi Burning, and discussed the movie in class. No one questioned the teacher's judgment. Indeed, Toscano supported the teacher's decision. There were no repercussions from students' parents simply because the teacher recommended and discussed an R-rated movie. Defendant Toscano attempted to distinguish the teacher's discussion on the grounds that the teacher was present to provide the necessary guidance to the discussion; the very same purpose served by a parent when he/she accompanies the child to an R-rated movie.
Defendant contends that if reviews of R-rated films are permitted, a faculty member will have to see every R-rated movie in order to allow a review to be published. Not so. Under Hazelwood, the pedagogical interests of the school do not extend beyond the style and content of the article. On the chance that a parent might misinterpret the mere presence of a review in the newspaper *544 as an endorsement by the defendant, a simple disclaimer to that effect would be a minimal accommodation to the First Amendment, where the content of the review is otherwise appropriate.
We believe the cases cited by our dissenting colleague in support of defendants' actions in this case are inapposite. Krizek v. Cicero-Stickney Tp. High School Dist. 201, 713 F. Supp. 1131 (N.D.Ill. 1989) and Poling v. Murphy, 872 F.2d 757 (6th Cir.1989), cert. denied, 493 U.S. 1021, 110 S.Ct. 723, 107 L.Ed.2d 742 (1990), were cases dealing with the inappropriate content of a teacher's and student's speech. Virgil v. School Bd. of Columbia County, Fla., 677 F. Supp. 1547 (M.D.Fla. 1988), aff'd, 862 F.2d 1517 (11th Cir.1989) and Webster v. New Lenox School Dist. No. 122, 917 F.2d 1004, 1007 (7th Cir.1990), are also content based cases that establish the school board's authority in making curriculum choices. Finally, Planned Parenthood of Southern Nevada, Inc. v. Clark County School Dist., 941 F.2d 817 (9th Cir.1991), holds that a school board may reject a commercial advertiser where it wishes to remain neutral on a matter of "political controversy." 941 F.2d at 829, citing Hazelwood, supra, 484 U.S. at 272, 108 S.Ct. at 570. There is no allegation in this case that R-rated films, per se, have created any political controversy in the defendant school district. In any event, it cannot be said that defendant has chosen to remain neutral on the subject of whether R-rated films should be seen by its students. Neutrality is not maintained when defendant's teachers are permitted to discuss R-rated films in the context of the curriculum, and even suggest that students see the film under discussion.
The judgment under review is affirmed.
D'ANNUNZIO, J.A.D., dissenting.
I agree with the majority's conclusion that the Pioneer Press was not a public forum. I disagree with the majority's application of Hazelwood School Dist. v. Kuhlmeier, 484 U.S. 260, 108 S.Ct. *545 562, 98 L.Ed.2d 592 (1988), to the facts in this case, and I would reverse the judgment of the lower court.
In Hazelwood, the Supreme Court recognized that speech or other forms of communication presented in school-sponsored publications might reasonably be perceived "to bear the imprimatur of the school." Id. at 271, 108 S.Ct. at 570, 98 L.Ed.2d at 605. The Court determined that "[e]ducators are entitled to exercise greater control" over expression in school-sponsored activities "to assure that ... readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school." Ibid. The Court ruled that educators may exercise editorial "control over the style and content of student speech in school-sponsored expressive activities" without violating the First Amendment "so long as their actions are reasonably related to legitimate pedagogical concerns." Id. at 273, 108 S.Ct. at 571, 98 L.Ed.2d at 606.
In the majority opinion, the Supreme Court gave examples of "legitimate pedagogical concerns." The Court included in its catalogue, speech that would interfere with the school's work, or impinge upon the rights of other students as well as speech that is "ungrammatical, poorly written, inadequately researched, biased or prejudiced, vulgar or profane, or unsuitable for immature audiences." Id. at 271, 108 S.Ct. at 570, 98 L.Ed.2d at 605.
Bethel School Dist. No. 403 v. Fraser, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), foreshadowed Hazelwood and provides additional definition to the concept of "legitimate pedagogical concerns." In Fraser, the Court upheld school disciplinary action against a student who delivered an "offensively lewd and indecent speech" to a school assembly. Id. at 685, 106 S.Ct. at 3165, 92 L.Ed.2d at 560. The Court explained:
The First Amendment does not prevent the school officials from determining that to permit a vulgar and lewd speech such as respondent's would undermine the school's basic educational mission. A high school assembly or classroom is no place for a sexually explicit monologue directed towards an unsuspecting audience of teenage students. Accordingly, it was perfectly appropriate for the school to *546 disassociate itself to make the point to the pupils that vulgar speech and lewd conduct is wholly inconsistent with the "fundamental values" of public school education.
[Id. at 685-86, 106 S.Ct. at 1365, 92 L.Ed.2d at 560.]
Hazelwood has been applied in a variety of circumstances to uphold school restrictions on speech. In Poling v. Murphy, 872 F.2d 757 (6th Cir.1989), cert. denied, 493 U.S. 1021, 110 S.Ct. 723, 107 L.Ed.2d 742 (1990), the court of appeals held that "[c]ivility is a legitimate pedagogical concern." Id. at 758. The court affirmed a summary judgment in favor of defendant in a civil rights action brought by a high school student whom school authorities had declared ineligible to run for student office. The declaration of ineligibility was a sanction for an offensive campaign speech delivered at a school assembly. In the speech the student had ridiculed an assistant principal. Though the court implied that the school administration had overreacted in disqualifying the student, it concluded that:
Local school officials, better attuned than we to the concerns of the parents/taxpayers who employ them, must obviously be accorded wide latitude in choosing which pedagogical values to emphasize, and in choosing the means through which those values are to be promoted. We may disagree with the choices, but unless they are beyond the constitutional pale we have no warrant to interfere with them. Local control over the public school, after all, is one of this nation's most deeply rooted and cherished traditions. See Milliken v. Bradley, 418 U.S. 717, 741-42, 94 S.Ct. 3112, 3125-26, 41 L.Ed.2d 1069 (1974).
[Id. at 762-63.]
Planned Parenthood of Southern Nevada, Inc. v. Clark County School Dist., 941 F.2d 817 (9th Cir.1991), was an action challenging the rejection of plaintiff's advertisement for publication in high school newspapers and other school publications. A majority of the court of appeals, sitting en banc, affirmed a judgment in favor of the school district. The court ruled that the school publications were not public forums and the school's decision to maintain a position of neutrality on a controversial issue was reasonable.[1]
*547 Krizek v. Cicero-Stickney Tp. High School Dist. 201, 713 F. Supp. 1131 (N.D.Ill. 1989) involved an R-rated film as does the present case. In Krizek, a non-tenured teacher sought to enjoin the school district from not renewing her contract because she had shown an R-rated film, About Last Night, in class. The district court rejected plaintiff's application on the ground that she had not demonstrated a likelihood of success on the merits. The trial court applied the Hazelwood standard and ruled that the school's pedagogic choice that the film was not appropriate for the classroom, considering the age and maturity of the students, was not an abuse of discretion. Id. at 1139. See also Virgil v. School Bd. of Columbia County, Fla., 677 F. Supp. 1547 (M.D.Fla. 1988) (school district did not violate First Amendment by removing from curriculum, text book containing the ancient Greek play Lysistrata and the narrative poem The Miller's Tale), aff'd, 862 F.2d 1517 (11th Cir.1989).
In the present case, the school administration did not publish plaintiff's movie reviews because it did not want to be perceived as promoting R-rated movies to junior high school students. I am persuaded that disassociating the school from acts which encourage seventh, eighth and ninth graders to view R-rated films is a legitimate pedagogical concern. Though many R-rated films may be considered innocuous, such as Mississippi Burning and Rain Man, others in the category well-deserve the R-rating and its concomitant warning that children under seventeen must be accompanied by a parent or guardian. The film About Last Night, which was graphically summarized in the court's opinion in Krizek, supra, is an example of the latter type.[2] I fail to see why a school may be permitted to disassociate itself from a student's speech *548 because it is laced with double entendre, as in Fraser, supra, but not disassociate itself from the promotion of R-rated films.
I agree with the majority's observation that "[t]he question of how much of this mature material should be seen by a child under 17 can become controversial." Op. at 543, 630 A.2d at 339. Consequently, by not publishing reviews for R-rated films defendants were maintaining a neutral position on a controversial issue as was the case in Planned Parenthood of Southern Nevada, supra. Defendants, through their position of neutrality, distanced the school from the parental decision regarding the films children should see.
Hazelwood recognized that shielding children from "material that may be inappropriate for their level of maturity" is a legitimate pedagogical goal. Hazelwood, supra, 484 U.S. at 271, 108 S.Ct. at 570, 98 L.Ed.2d at 605. See Webster v. New Lenox School Dist. No. 122, 917 F.2d 1004, 1007 (7th Cir.1990) ("A junior high school student's immature stage of intellectual development imposes a heightened responsibility upon the school board to control the curriculum."). The defendants' determination that it is inappropriate for the school to encourage the viewing of R-rated films is reasonable, thereby complying with the Hazelwood standard that school officials are "entitled to regulate the contents of [the school newspaper] in any reasonable manner." Hazelwood, supra, 484 U.S. at 270, 108 S.Ct. at 569, 98 L.Ed.2d at 605.
Moreover, the impact on plaintiff's freedom of expression is, at most, slight. Defendants did not prevent plaintiff from expressing his views about the films or about any other subject. Plaintiff was merely precluded from expressing his views in a school-sponsored publication.
I am persuaded that the Hazelwood construct provides sufficient protection to students' rights of free expression and, therefore, perceive of no basis, or reason, to find greater protection of those rights in our State Constitution.
Judgment should have been entered in favor of defendants.
NOTES
[1] Hereafter, all references to plaintiff in the singular are to Brien Desilets, unless otherwise noted.
[2] Plaintiff later amended his complaint to include two additional counts of censorship pertaining to an additional article written by him, and two counts alleging an illegal search of his person prior to a field trip. The additional counts of censorship are not the subject of this appeal since plaintiff, the losing party on those counts below, has chosen not to appeal from that portion of the judgment. The two counts pertaining to the search are the subject of a companion appeal (A-788-91T1).
[3] We also agree with the trial judge that the New Jersey Constitution exists as a "cognate source" of individual freedoms and personal liberties, including freedom of expression. We further agree that, in certain circumstances, our Supreme Court has interpreted the New Jersey Constitution as providing more expansive rights of freedom of expression than the federal Constitution. State v. Schmid, 84 N.J. 535, 553-56, 423 A.2d 615 (1980), appeal dismissed sub nom. Princeton Univ. v. Schmid, 455 U.S. 100, 102 S.Ct. 867, L.Ed.2d 855 (1982). See also Sister v. Gannett Co. Inc., 104 N.J. 256, 271-72, 516 A.2d 1083 (1986). However, no reported decision has addressed the New Jersey Constitution in the context of students' rights. We see no reason to blaze new trails where adequate relief can be granted plaintiff under well-formed federal constitutional standards.
[1] The school district's guidelines for advertisements in school publications precluded advertisements for X- or R- rated movies.
[2] The recent film, Basic Instinct, is another example. Basic Instinct featured Michael Douglas and Sharon Stone. The opening scene shows a male and female, both naked, engaging in sexual intercourse, the female astride the male. As the couple reaches a sexual climax, the female kills the male by repeatedly stabbing him with an ice pick.