647 A.2d 150

PATRICIA DESILETS, ON BEHALF OF AND AS NATURAL GUARDIAN OF BRIEN DESILETS, PLAINTIFF–RESPONDENT, v. CLEARVIEW REGIONAL BOARD OF EDUCATION, MICHAEL P. TOSCANO, SUPERINTENDENT AND CHARLES BISHOP, PRINCIPAL, DEFENDANTS–APPELLANTS.

Argued May 3, 1994—Decided September 22, 1994.

586

*Robert A. Muccilli* argued the cause for appellants (*Capehart & Scatchard,* attorneys; *Alan R. Schmoll,* of counsel).

*William H. Buckman,* on behalf of the American Civil Liberties Union of New Jersey, argued the cause for respondent.

*Gregory J. Schwartz* submitted a brief on behalf of *amicus curiae,* Student Press Law Center (*Porzio, Bromberg & Newman,* attorneys).

PER CURIAM.

The mother of a junior high school student brought this action against a school board and the school's superintendent and principal challenging their refusal to publish in the student newspaper her son's movie reviews of R-rated films. She contended that the action taken by the school authorities violated her son's freedom of expression under the state and federal constitutions. The school authorities assert that they did not violate the student's right to free expression because the decision to withhold publication of the movie reviews was based on valid educational policy.

The trial court ruled that the school principal's decision to delete the pupil's movie reviews from the school newspaper did not violate his expressional rights under the First Amendment of the Federal Constitution because such action was reasonably related to legitimate pedagogical concerns, as required by the United States Supreme Court in *Hazelwood School District v. Kuhlmeier*, 484 *U.S.* 260, 108 *S.Ct.* 562, 98 *L.Ed.*2d 592 (1988). Nevertheless, the trial court determined that the student's rights had been violated under the State Constitution, which, it found, provided broader protection of free expression than the First Amendment.

The Appellate Division, with a dissent, affirmed the judgment of the trial court. 266 *N.J.Super.* 531, 630 *A.*2d 333 (App.Div.1993). The Appellate Division majority reasoned that the school authorities had violated the student's First Amendment rights, not the State Constitution, because under *Hazelwood*, no legitimate pedagogical reasons justified the censorship of the R-rated movie reviews. However, the dissent concluded that under *Hazelwood* the student's expressional rights had not been violated because the actions taken by the school authorities were reasonably related to legitimate pedagogical concerns.

We granted the certification petition of the school board, 134 *N.J.* 565, 636 *A.*2d 522 (1993).

We now affirm the judgment of the Appellate Division substantially for the reasons set forth in the opinion of Judge Keefe, and rely on the Appellate Division's rendition of the case's facts and procedural history. We comment only briefly on that opinion to address the issue related to the relevance of the type of student expression that may be subject to restrictive school policy and, further, to indicate the appropriate procedures for adjudicating this kind of controversy in the future.

I

In *Hazelwood*, the United States Supreme Court determined that a school principal's censorship of student-written articles for

the student newspaper was not violative of the First Amendment because the decision of the school authorities was reasonably related to legitimate pedagogical concerns. 484 *U.S.* at 260, 108 *S.Ct.* at 562, 98 *L.Ed.*2d at 592.

The Supreme Court rejected the students' claims that the student newspaper was a public forum. The Court ruled that "public schools may be deemed to be public forums only if school authorities have 'by policy or practice' opened those facilities 'for indiscriminate use by the general public' or by some segment of the public, such as student organizations." *Id.* at 267, 108 *S.Ct.* at 568, 98 *L.Ed.*2d at 603 (quoting *Perry Educ. Ass'n v. Perry Local Educ. Ass'n,* 460 *U.S.* 37, 47, 103 *S.Ct.* 948, 956, 74 *L.Ed.*2d 794, 806 (1983)). "If the facilities have instead been reserved for other intended purposes," then the forum is not a public one, and the school "may impose reasonable restrictions on the speech of students, teachers, and other members of the school community." 484 *U.S.* at 267, 108 *S.Ct.* at 567–68, 98 *L.Ed.*2d at 603. The Supreme Court concluded that the newspaper was not a public forum because the student newspaper was part of the school curriculum, a faculty member taught the newspaper course during regular school hours, and the students received grades and academic credit for participating on the newspaper. *Id.* at 268–69, 108 *S.Ct.* at 568–69, 98 *L.Ed.*2d at 603–04.

Whether a school newspaper is a "public forum" can be determinative of whether attempts to limit or control the expressional activities undertaken by the newspaper violate constitutional rights. The power of the State to limit expressional activity using public forums, that is, in places that have been devoted to assembly and debate, such as streets and parks, is severely limited. *Perry, supra,* 460 *U.S.* at 45, 103 *S.Ct.* at 954, 74 *L.Ed.*2d at 804. A state may enforce a content-based regulation restricting expressional activity in such public forums only if such a regulation is necessary to serve a compelling state interest and that regulation is narrowly drawn. *Ibid.* In addition, time, place, and manner restrictions may also be imposed on expression if those

restrictions are content-neutral, narrowly tailored to serve a significant governmental interest, and "leave open ample alternative channels of communication." *Ibid.* Those strictures, however, do not apply to speech or expression that is undertaken in a public forum, as exemplified by the Supreme Court's decision in *Hazelwood.*

The Appellate Division was soundly guided on this issue by the Supreme Court. It ruled that the student newspaper, *Pioneer Press,* is not a public forum. 266 *N.J.Super.* at 538, 630 *A.*2d 333. Concededly, students participating in the *Pioneer Press,* unlike those in *Hazelwood,* did not receive grades or academic credit for their participation in the newspaper. *See Hazelwood, supra,* 484 *U.S.* at 268–69, 108 *S.Ct.* at 568–69, 98 *L.Ed.*2d at 603–04. Nor was the publication part of regular classroom assignments. *See ibid.* However, the publication was supervised by a designated faculty member. Moreover, as the Appellate Division noted, "students, parents and members of the public might reasonably perceive [school-sponsored publications] to bear the imprimatur of the school," *id.* at 271, 108 *S.Ct.* at 569–70, 98 *L.Ed.*2d at 605, "whether or not [such activities] occur in the traditional classroom setting, as long as [those activities] are supervised by faculty members and [are] designed to impart knowledge or skills to the student participants and their audiences," 266 *N.J.Super.* at 540, 630 *A.*2d 333.

We therefore agree with the determination of the Appellate Division that the *Pioneer Press* is not a public forum.

## II

The Supreme Court recognized that although neither students nor teachers "shed their constitutional rights of freedom of speech or expression at the school house gates," *Tinker v. Des Moines School Dist.,* 393 *U.S.* 503, 506, 89 *S.Ct.* 733, 736, 21 *L.Ed.*2d 731, 737 (1969), speech occurring in a non-public forum, as in *Hazelwood,* may be subject to reasonable restrictions. With respect to a school publication, it ruled in *Hazelwood* that "edu-

cators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." 484 *U.S.* at 273, 108 *S.Ct.* at 571, 98 *L.Ed.*2d at 606. The Court provided examples of legitimate pedagogical concerns, which included "speech that is ... ungrammatical, poorly written, inadequately researched, biased or prejudiced, vulgar or profane, or unsuitable for immature audiences." *Id.* at 271, 108 *S.Ct.* at 570, 98 *L.Ed.*2d at 605.

We agree with the Appellate Division that the R-rated movie reviews in this case do not appear to raise educational concerns that call for the kinds of editorial control exemplified by the Supreme Court in *Hazelwood.* The reviews contained brief descriptions of two movies with terse recommendation:

Mississippi Burning    Rated: R (Starring William [sic] DaFoe and Gene Hackman)

Mississippi Burning is about the murder of three civil right activists in Philadelphia, Mississippi in 1964. Two F.B.I. agents, Hackman and DaFoe, are sent to Mississippi to investigate the disappearance of three men. When they arrive, they find themselves unwanted by the people and the local police. None of the blacks will talk to the men, because they were harassed by the KKK (Ku Klux Klan) for doing so. In the end the bodies are found, the police and Klan members are jailed and the F.B.I. leaves. The movie is worth the price of your ticket, but if you're looking for facts they're not here.

Rain Man    Rated: R (Starring Tom Cruise and Dustin Hoffman)

In this film, Charlie Babbit (Tom Cruise) finds that he has a brother, Raymond (Dustin Hoffman) that [sic] has inherited three million dollars in their father's will. However, Raymond is autistic and does not understand the concept of money. Charlie then kidnaps "Rain Man" from a mental institution, and the two leave for a week long drive across the country. On this ride the two become great friends and experience many adventures. Dustin Hoffman did an excellent job of playing an autistic savant. The movie is hilariously funny and I think that everyone should see it.

[266 *N.J.Super.* at 534, 630 *A.*2d 333.]

In addressing the general question of what kind of school policy constitutes a legitimate pedagogical concern that would justify the refusal to publish R-rated movie reviews in a school newspaper, the Appellate Division distinguished the communications that were

challenged in *Hazelwood* from those involved in this case. Specifically, the Appellate Division reasoned:

> The significant distinction between *Hazelwood* and this case is that the material in *Hazelwood* was censored because of its content and journalistic style. In the instant matter, it is conceded that the censorship had nothing to do with the style of the review, but only its subject matter. (This is an important distinction; content is what is written; subject is what is written about.).... [T]he decision to censor was based solely on the fact that the subject matter of the review was R-rated. The point of the censorship was not to address stylistic deficiencies or the words chosen by the writer to convey his information; it was to suppress the idea itself.

[*Id.* at 541–42, 630 *A.2d* 333.]

Essentially, the Appellate Division found that the "pedagogical interests" considered by the *Hazelwood* Court as sufficient to justify a restriction on speech did not extend beyond the "style and content" of the materials. Further, it narrowly interpreted "content" as used by the Supreme Court in *Hazelwood* to apply only or essentially to the language of the communication.

We do not share the certainty of the Appellate Division that *Hazelwood* provides or turns on such a distinction between subject-matter on the one hand and style and content on the other. The facts of *Hazelwood* do not suggest that distinction. The Supreme Court there found that the students' commentary on their sexual histories, specifically their use or nonuse of birth control, could be reasonably determined to be inappropriate for the school newspaper. 484 *U.S.* at 274–75, 108 *S.Ct.* at 572, 98 *L.Ed.*2d at 607. If the Supreme Court, in expressing its concerns with "content and journalistic style," was focusing essentially on the language used or the form of expression, and not the subject-matter of the communication, then the non-graphic and neutral nature of the language used to describe the pregnant girls' stories would have inferentially been given more prominence in the Court's analysis and possibly have brought the Court to a different conclusion. Instead, the Court's focus on the account of the girls' sexual histories and their use or nonuse of birth control—what was "written about"—indicates, at least indirectly or partially, that the subject-matter of the articles was also a relevant

consideration in determining the scope of the educational concerns over whether such communications should be allowed in a school setting.

We need not, however, further address or resolve the significance of that alleged distinction between subject-matter and content or style in determining the scope and application of educational policy. We are satisfied that the evidence in this case concerning the school's educational policy was, at best, equivocal and inconsistent. The school board's position with respect to the policy that applied to student publications, specifically as related to matters such as movie reviews, was vague and highly conclusory. It conceded that it had no specific policy regarding movie reviews of R-rated films; nevertheless, it argued that the action taken by the principal and superintendent complied with that "policy." 266 *N.J.Super.* at 536, 630 *A.*2d 333. Further, how any "policy" was applied to the student's R-rated movie reviews remains unclear. The school authorities assert that the publication of Brien's R-rated movie reviews violated its official policy because those reviews constituted "material which advocated the use or advertised the availability of any substance believed to constitute a danger to student health." *Ibid.* However, no one explained how such R-rated movie reviews posed a danger to student health. Moreover, if such R-rated movie reviews did violate that policy, the evidence strongly suggests that the policy was often ignored or applied inconsistently because R-rated movies were discussed in class, referred to and available in the school library, and, in fact, reviewed and published by the student newspaper. *Id.* at 535, 630 *A.*2d 333.

The foregoing does not mean that the school had no legitimate pedagogical concerns over the publication of articles dealing with R-rated movies or, indeed, did not in fact have an educational policy dealing with that subject. Rather, the record suggests only that such a policy, if it exists, is vaguely defined and loosely applied and that its underlying educational concerns remained essentially undefined and speculative.

In sum, we agree with the Appellate Division that under *Hazelwood*, defendants failed to establish a legitimate educational policy that would govern the publication of the challenged materials and, as a consequence, the school authorities, under these circumstances, did violate the student's expressional rights under the First Amendment.

We thus agree, also, with the Appellate Division that because this case can be decided on federal constitutional grounds, we have no reason to consider the State constitutional claims. *Id.* at 538 n. 3, 630 *A.*2d 333.

### III

The difficulty in resolving the basic question of whether defendants had an established and legitimate educational policy that would justify restrictions of expression by students is fully illustrated in this case, not only by the equivocal and vague evidence that was adduced to demonstrate the existence of such a policy, but also by the different explanations offered by the witnesses concerning the meaning and application of that policy. Those difficulties are further exemplified by the different conclusions with respect to the existence and meaning of such an educational policy reached by the several judges who participated at all levels of this litigation. The inherent complexity surrounding the nature and scope of educational policy affecting expressional activity demonstrates that the educational legitimacy of a school policy governing such activity should, if possible, first be considered and determined by the administrative agency charged with regulating public education.

Administrative agencies have the authority to determine matters within the special province of their regulatory jurisdiction and expertise. *See Boss v. Rockland Elec. Co.,* 95 *N.J.* 33, 39, 42, 468 *A.*2d 1055 (1983); *see also Hinfey v. Matawan Regional Bd. of Educ.,* 77 *N.J.* 514, 531–32, 391 *A.*2d 899 (1978) ("Comity and deference to cognate tribunals are designed to assure that a controversy, or its most critical facets, will be resolved by the

forum or body which, on a comparative scale, is in the best position by virtue of its statutory status, administrative competence and regulatory expertise to adjudicate the matter."). That proposition is particularly apt with respect to controversies under the educational laws, which should be brought before the Commissioner of Education. *N.J.S.A.* 18A:6–9 (granting Commissioner of Education jurisdiction over "all controversies and disputes arising under the school laws"); *Hinfey, supra,* 77 *N.J.* at 525, 391 *A.*2d 899 (noting "great breadth" of Commissioner of Education's authority).

■ Administrative agencies are clearly empowered to determine issues within their jurisdiction even though the resolution of those issues implicates constitutional claims. *See, e.g., Christian Bros. Inst. v. N.N.J. Interscholastic League,* 86 *N.J.* 409, 416, 432 *A.*2d 26 (1981) (noting that for constitutional issues implicated in administrative action involving discriminatory league membership, "[a]dministrative agencies have power to pass on constitutional issues ... when relevant and necessary to resolution of a question concededly within their jurisdiction"); *Hunterdon Cent. High Sch. Bd. of Educ. v. Hunterdon Cent. High School Teachers' Ass'n,* 174 *N.J.Super.* 468, 474–75, 416 *A.*2d 980 (App.Div.1980), *aff'd o.b.,* 86 *N.J.* 43, 429 *A.*2d 354 (1981) (ruling that administrative agency did not exceed its authority by passing on First Amendment issue when necessary to resolve scope of negotiations issue because " 'administrative agencies are competent to pass upon constitutional issues germane to proceedings before them,' [when] ... 'such action is necessary so as to better focus the issue for judicial review, if such action is later necessary' ") (quoting *Alcala v. Wyoming State Bd. of Barber Examiners,* 365 *F.Supp.* 560, 564 (D.Wyo.1973)); *Paterson Redevelopment Agency v. Schulman,* 78 *N.J.* 378, 386–88 (ruling that claims should be heard, "as a preliminary matter, by the [administrative] body having expertise in the area" and that "[t]his is particularly important where the ultimate decision rests upon factual determinations lying within the expertise of the agency," including those relevant to "constitu-

tional issues"), *cert. denied,* 444 *U.S.* 900, 100 *S.Ct.* 210, 62 *L.Ed.*2d 136 (1979); *Brunetti v. Borough of New Milford,* 68 *N.J.* 576, 590–91, 350 *A.*2d 19 (1975) ("The mere obligation that a constitutional issue is involved does not relieve plaintiffs [who were landlords challenging 'as applied' constitutionality of rent control ordinance] of the exhaustion [of administrative remedies] requirement. To avoid this requirement, plaintiff must demonstrate not only that the constitutional question is colorable, but that the matter contains no factual questions which require administrative determination."); *Roadway Express, Inc. v. Kingsley,* 37 *N.J.* 136, 179 *A.*2d 729 (1962) (ruling that whether corporate franchise tax was unconstitutional as applied was issue initially to be determined by Division of Taxation); *Levitt & Sons, Inc. v. Div. Against Discrimination,* 31 *N.J.* 514, 523, 158 *A.*2d 177 (1960) (ruling that because constitutionality of housing statute raised only legal questions and because case implicated administrative agency's jurisdiction, "administrative expertise would be of no real value"); *Clark v. N.J. Div. of Motor Vehicles,* 211 *N.J.Super.* 708, 710, 512 *A.*2d 588 (App.Div.1986) (ruling that Division of Motor Vehicles properly did not decide whether automobile insurers surcharge constituted *ex post facto* laws because issue not within agency's expertise).

This Court has "repeatedly acknowledged and approved the administrative handling of educational controversies that arise in the context of constitutional . . . litigation." *Abbott v. Burke,* 100 *N.J.* 269, 300, 495 *A.*2d 376 (1985); *see, e.g., Balsley v. North Hunterdon Bd. of Educ.,* 117 *N.J.* 434, 442, 568 *A.*2d 895 (1990) (concerning gender discrimination in school athletics); *In re Upper Freehold Regional Sch. Dist.,* 86 *N.J.* 265, 430 *A.*2d 905 (1981) (involving revenue raising); *Hinfey, supra,* 77 *N.J.* at 514, 391 *A.*2d 899 (regarding gender discrimination in employment in school districts); *Winston v. South Plainfield Bd. of Educ.,* 64 *N.J.* 582, 586–87, 319 *A.*2d 226 (1974) (involving free speech); *Jenkins v. Morris Township School Dist.,* 58 *N.J.* 483, 279 *A.*2d 619 (1971) (concerning racial discrimination; *Booker v. Plainfield Bd. of Educ.,* 45 *N.J.* 161, 212 *A.*2d 1 (1965) (involving racial discrimination).

In *Abbott*, this Court ruled that whether the financing provisions of the Public School Education Act were constitutional under the State Constitution's "thorough and efficient education" clause should more appropriately be brought before the Commissioner of Education to develop a more informed record with respect to issues that clearly involved educational expertise. The Court was "satisfied that the presence of constitutional issues and claims for ultimate constitutional relief" did not "preclude resort in the first instance to administrative adjudication." 100 *N.J.* at 296–97, 495 *A.*2d 376. Therefore, it concluded that that case could and "should be considered in the first instance by the appropriate administrative agency." *Id.* at 301, 495 *A.*2d 376. The Court stated further in *Abbott* that administrative consideration of the educational concerns was especially necessary because "the ultimate constitutional issues are especially fact-sensitive and relate primarily to areas of educational specialization." *Ibid.*

In this case, the ultimate constitutional question—whether a student's constitutional expressional rights have been violated by restrictions imposed by school authorities—is answered in large measure by the determination of whether those restrictions are related to and effectuate "legitimate pedagogical goals." That determination clearly and unavoidably implicates "the highest level of professional expertise and judgment in the educational field," *see Hinfey, supra,* 77 *N.J.* at 532, 391 *A.*2d 899, and, therefore, is one more appropriate for initial review and resolution by the Commissioner of Education.

## IV

For the reasons expressed in Judge Keefe's opinion, as well as those set forth here, the judgment of the Appellate Division is affirmed.

Justices CLIFFORD and STEIN do not join in Point III of this opinion.

POLLOCK, J., concurring and dissenting.

I agree with the majority "that the evidence in this case concerning the school's educational policy was, at best, equivocal and inconsistent," and that "[t]he school board's position with respect to the policy that applied to student publications, specifically as related to matters like movie reviews, was vague and highly conclusory." *Ante* at 593, 647 *A.*2d at 154. Hence, I agree that the Court should affirm the judgment of the Appellate Division. I believe, however, that the holding of the United States Supreme Court in *Hazelwood School District v. Kuhlmeier,* 484 *U.S.* 260, 108 *S.Ct.* 562, 98 *L.Ed.*2d 592 (1988), requires that we accord more respect to the decisions of school officials than does the majority.

*Hazelwood* states that "educators· do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273, 108 *S.Ct.* at 571, 98 *L.Ed.*2d at 606. Those concerns include "speech that is ... unsuitable for immature audiences." *Id.* at 271, 108 *S.Ct.* at 570, 98 *L.Ed.*2d at 605.

The Rating Board of the Motion Picture Association of America has adopted a rating system that includes:

> **R:** **"Restricted, under 17 requires accompanying parent or adult guardian."**
>
> In the opinion of the Rating Board, this film definitely contains some adult material. Parents are strongly urged to find out more about this film before they allow their children to accompany them.
>
> An R-rated film may include hard language, or tough violence, or nudity within sensual scenes, or drug abuse or other elements, or a combination of some of the above, so that parents are counseled, in advance, to take this advisory rating very seriously. Parents must find out more about an R-rated movie before they allow their teenagers to view it.
>
> [Jack Valenti, Motion Picture Association of America, *The Voluntary Movie Rating System* 9 (1994).]

I believe that school officials may conclude that the restriction of the review of R-rated films in a junior high school newspaper reasonably relates to legitimate educational concerns. Some par-

ents and educators may have reservations about permitting young adolescents to see R-rated films. School officials may properly adopt a standard that prevents the review of a category of films, such as those that are R-rated, even if the category includes films that some people might find the appropriate subject of a review.

The education of children is an informal partnership consisting of students, parents, teachers, administrators, and school boards. Parents expect that teachers and administrators will be responsible for the students. In discharging those responsibilities, educators make numerous decisions that restrict students' freedom. In a representative democracy, students, like the general population, regularly accept policy decisions made by appointed and elected officials. I see nothing unconstitutional in requiring students to accept the policy decisions of school officials concerning the review in a junior high school newspaper of R-rated films.

Junior high school students between the ages of twelve to fourteen years, such as the students at Clearview, are impressionable. The Legislature has restricted the activities of teenagers by preventing them from driving until they are seventeen, *N.J.S.A.* 39:3–10; drinking alcoholic beverages until they are twenty-one, *N.J.S.A.* 9:17B–1b; and from entering casinos until they are twenty-one, *N.J.S.A.* 9:17B–1c. Many parents and educators may find R-rated films unsuitable for children in the seventh to ninth grades. Thus, the Rating Board counsels parents to take an R-rating "very seriously. Parents must find out more about an R-rated movie before they allow their teenagers to view it." Valenti, *supra*, at 9. School officials could find an educational purpose in not permitting the use of the student newspaper as a means of promoting R-rated films, which some parents do not want their children to see. Students would remain free, of course, to continue to see the films if accompanied by an adult and to talk to each other about the films both in and out of school. Preventing publication of a review of an R-rated film in a school newspaper is hardly likely to stop teenagers from seeing or talking about the film.

Like the majority, I believe that the Commissioner of Education could perform a useful role in preventing such litigation. I believe, however, the Commissioner could serve a more useful role by reviewing the policies of local boards before litigation. On a matter as delicate as balancing constitutional rights and the authority of school officials, the Commissioner could help by defining legitimate educational concerns. By rendering a declaratory order, *N.J.A.C.* 6:24–2.1, the Commissioner might prevent such suits before they are filed.

Chief Justice WILENTZ joins in this opinion.

*For affirmance*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Concurring in part*—Justices CLIFFORD and STEIN—2.

*Concurring in part; dissenting in part*—Chief Justice WILENTZ, and Justice POLLOCK—2.